Babu Thanu CHELLEN,
et al., Plaintiffs,

v.

JOHN PICKLE CO., INC., and John
Pickle, Jr., Defendants.

Equal Employment Opportunity
Commission, Plaintiff,

v.

John Pickle Company, Inc., Defendant.

No. 02–CV–85–EA (M).

United States District Court,
N.D. Oklahoma.

Aug. 26, 2004.

Richard D. Marrs, Fred Everett Stoops, Sr., Keith Allen Ward, Mark Louis Collier, Richardson, Stoops, Richardson & Ward, Jeff Nix, Eddie D. Ramirez, Bill K. Felty, Tulsa, OK, Joe W. McDoulett, Oklahoma City, OK, for Plaintiffs.

J. Thomas Mason, Philip James McGowan, Linda Cole McGowan, Carpenter, Mason & McGowan, Robert A. Canino, Dallas, TX, Michelle Robertson, Oklahoma City, OK, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW (PHASE ONE)

EAGAN, District Judge.

In these consolidated cases, the fifty-two individual plaintiffs (collectively referred to herein as the "Chellen" plaintiffs for first-named plaintiff Babu Thanu Chellen) brought an action against defendants John Pickle Company, Inc. ("JPC") and John Pickle, Jr. ("John Pickle") for (1) violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219; (2) race discrimination; (3) deceit; (4) false imprisonment; (5) intentional infliction of emotional distress; (6) violation of Title VII of the Civil Rights Act of 1964; and (7) violation of the Immigration Reform and Control Act of 1986 ("IRCA"). The Court previously dismissed the Chellen plaintiffs' claims for violation of Title VII because they failed to exhaust their administrative remedies. It also dismissed the Chellen plaintiffs' claims for violation of the Immigration Reform and Control Act of 1986. The EEOC has brought an action against JPC for violations of the FLSA, Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e–5(f)(1) and (3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A.

The Court has chosen to proceed in three phases. First, the Court will determine whether the Chellen plaintiffs were "trainees" or "employees" under the FLSA. If the Court determines that they were "employees," the Court will proceed to a determination of liability on all claims. If defendants are found liable, the Court will proceed to a determination of damages. The Court held a non-jury trial in the first phase of these proceedings September 8–18, 2003.

### INTRODUCTION

The Chellen plaintiffs, who are all citizens of India, came to work at JPC's Tulsa, Oklahoma facility in 2001. They allege that defendants made false representations when they recruited the Chellen plaintiffs for JPC employment, required them to work in excess of forty hours per week, paid them below minimum wage, compelled them to eat and sleep at the JPC facility, restricted their ability to leave or travel freely to other locations, placed armed guards at the gates of the facility to discourage their travel or compel them to stay at the facility when they were not on duty or working, and held them unlawfully against their will within the confines of the JPC facility. Defendants deny most of the allegations and allege, in defense, that the Chellen plaintiffs were employed by an Indian company, AL Samit International ("AL Samit"), to be trained in the United

States by JPC for work at a JPC-affiliated company in Kuwait. Defendants contend that the Chellen plaintiffs entered the United States with visas authorizing entry into the United States for the sole purpose of receiving training at JPC. Defendants maintain that JPC provided dormitories where the Chellen plaintiffs could sleep, and a cafeteria, staffed by Indian cooks, where the Chellen plaintiffs could eat. Whether the Chellen plaintiffs were "trainees" or "employees" is significant because, if they were "employees," they were entitled to minimum wage and overtime compensation.

## FINDINGS OF FACT

Any conclusion of law which is more appropriately characterized as a finding of fact is incorporated herein.

### JPC's Expansion into the Middle East

1. Prior to ceasing all operations on or about October 30, 2002, JPC designed and fabricated products for use in the petrochemical and power industries. JPC divided the fabrication of custom-made products into four areas: pressure vessel, structural, production equipment, and special products. In the late 1990s, JPC began developing business in Kuwait and the Middle East. To complete orders for its expanding business, JPC trained 6 individuals from Kuwait in 1999, and 20 individuals from India and Pakistan in 2001, at the JPC facility in Tulsa, Oklahoma. The training program for these individuals was structured and successful in equipping workers for JPC's Middle East business venture. John Pickle made remarks indicating that the training program was also a "good deal" for JPC because the trainees

provided "cheap labor." (*See* Pl.Ex. 68; Tr. 268–69.) [1]

2. Thereafter, JPC entered into a joint venture, John Pickle Middle East ("JPME"), with a company known as Kuwait Pipe Industries and Oil Services Company ("KPIOS"). (Pl.Ex. 4.) KPIOS employed and paid all employees working at JPME. KPIOS recruited twenty welders and fitters from India, who signed employment agreements with KPIOS to work at JPME in Kuwait following the completion of their training at the JPC facility in Tulsa.

### AL Samit's Recruitment

3. Defendants contend that 51 of the 52 Chellen plaintiffs were recruited for the same purpose as the 20 who signed employment agreements with KPIOS: to work at JPME in Kuwait upon completion of their training in Tulsa.[2] Unfortunately, this purpose was not communicated to the Chellen plaintiffs when they were hired by AL Samit in 2001, and both KPIOS and defendants denied this purpose in an agreement to terminate and settle the JPME joint venture in November 2002. (Pl.Ex. 70.) JPC contracted with AL Samit for AL Samit to recruit, pre-screen, and arrange for testing of the Chellen plaintiffs and others.

4. AL Samit required large payments of money from the men who desired jobs with JPC, and it led them to believe that they would be able to obtain permanent jobs with JPC in the United States if they performed satisfactorily. (*See, e.g.,* Tr. 440–42, 687–88, 690.) Specifically, the Chellen plaintiffs were told that: they would be given free room and board; their

---

1. "Tr." refers to the "Transcript of Non–Jury Trial Proceedings" held September 8–18, 2003.

2. In addition to the welders, fitters, roll/brake operators, electricians, and maintenance personnel recruited, AL Samit recruited two cooks, at JPC's request, to prepare meals for the recruits at the JPC facility in Tulsa. One of the cooks is not a plaintiff in this case; the other is. The parties admit that the cooks were not trainees.

medical expenses and insurance would be paid by JPC; the job would be for at least two years, but could be long-term thereafter; and the job would pay from $650 per month plus overtime, with pay increases after six months, to $1,200 per month after 18 months.[3] (Tr. 441–43.) AL Samit prepared the Chellen plaintiffs' visa applications and obtained their signatures thereon. (Pl. Exs. 16A–16AAA; *e.g.,* Tr. 456, 722.) Many of these plaintiffs left good jobs or their own successful businesses, and some obtained loans from family and friends to pay large "fees" required by AL Samit. (*E.g.,* Tr. 444–48, 463–65, 683–86, 687–88, 694–97.) Some also traveled long distances, at their own expense, for testing and application purposes. (*E.g.,* Tr. 457, 688–89.)

5. JPC's principal recruiter and Director of Marketing, Ray Murzello, testified that he sought workers with a track record working production equipment or with pressure vessels in a reputable indian company. He specifically sought persons with five to ten years of experience—some with large industrial corporations such as Larsen & Toubro. The men he recruited were experienced, skilled workers who, in his opinion, simply needed to learn to work faster, more efficiently, and more independently. (Jt.Ex. 1, Depo. Tr. 38–42.) He described them as "excellent" workers who could work independently. He also explained that JPC would not want workers who could not perform fabrication work on the vessels JPC produced for customers, because JPC could not risk losing business by tolerating unsatisfactory work product. (*Id.* 98–99.) Murzello described the Chellen plaintiffs as "professional" workers and not workers in "apprenticeship." (*Id.* at 107.) The Chellen plaintiffs' employment histories and qualifications substantiate

and confirm the expertise of the Chellen plaintiffs in their respective trades; some had won national competitions for their work skills. (Pl. Exs. 19A–19YY; Tr. 433–34.)

6. In a letter to the former United States Immigration and Naturalization Service ("INS"), Murzello represented that the training period for the Indian nationals would be for a period up to 12 months, and the Indian nationals would be returned to India upon completion of their training. (Pl.Ex. 52.) In letters to the United States Consulate in India, Murzello repeatedly detailed the long-term financial benefits to JPC of the JPC "training program." (Pl.Exs.10, 38, 39.)

7. John Pickle traveled to India for a personal meeting with each of the Chellen plaintiffs, and a general meeting with all of them. He communicated through various translators, including AL Samit's owner, Gulam Peshimam, to confirm the terms of the Chellen plaintiffs' agreement to work at the JPC facility. In addition, John Pickle stated that the Chellen plaintiffs might be able to obtain drivers' licenses if they had driving experience, and they would be afforded the promised amenities according to American standards. After their meetings with John Pickle, the Chellen plaintiffs returned to their homes or stayed in Bombay and awaited instructions from AL Samit as to their departure dates. (Tr. 451–56, 688–92.)

***Departure from India***

8. When the Chellen plaintiffs arrived in Bombay for departure, AL Samit required each Chellen plaintiff to sign an "offer letter" as a condition of obtaining a position at the JPC facility. (Def.Exs.1E–48E, 49D–53D.) The Chellen plaintiffs

---

3. Other testimony indicated that they were promised $800 per month (Tr. 689), and documents indicate that all of the workers other than the cooks would be paid from $500 to $550 per month. (Def. Ex. 54, at 3.)

were required to sign these and other documents before they boarded the airplane departing India for the United States. (Tr. 458, 464–65, 693–95.) AL Samit and defendants also required the Chellen plaintiffs to sign an "undertaking," which stated that they did not pay money to AL Samit for travel or the JPC job. (Def. Exs. 1F–48F; 464–65, 696–97.) Plaintiffs did not fully comprehend what they were signing or why, and some of them inquired as to the inconsistencies they perceived as to the terms in the written documents and prior representations. They were told that the differences were because of the terrorist attack on the World Trade Center on September 11, 2001. (Tr. 459–60, 462, 693–95, 698.)

9. Despite the inconsistencies, the Chellen plaintiffs felt they had no choice but to sign the documents, at the last minute, after having invested so much of their money and time into the pursuit. They were assured by AL Samit that these were mere formalities, and not the true conditions of their impending employment. In particular, they were under the impression that they were being hired for employment, not selected for a training program. (*E.g.*, Tr. 463–65, 695–97.)

10. JPC or AL Samit quickly obtained B1 or B2 visas for the Chellen plaintiffs. These are business visitor visas which can be obtained through a faster and less scrutinized process than an H2B visa for temporary work or an H3 visa for training. (Tr. 1278–83.)

### At the JPC Facility

11. The Chellen plaintiffs arrived in three groups, on separate dates, at the JPC facility. Thirty arrived on October 11, 2001; seventeen arrived on November, 10, 2001; and five arrived on December 27, 2001. The last five worked in Kuwait at JPME for a short time before they came to JPC in Tulsa. Christina Pickle, John Pickle's wife, took the Chellen plaintiffs' passports, visas, return-trip airline tickets, and I–94s[4] and placed them in a safe. (Tr. 277–78, 293.) Defendants set up separate bank accounts for each Chellen plaintiff at Gold Bank in Tulsa, Oklahoma, and AL Samit paid the Chellen plaintiffs by depositing money into these accounts. The Chellen plaintiffs' pay per hour ranged from $2.89 to $3.17. (Pretrial Order, Dkt. # 132, § III(H).)

12. Defendants paid AL Samit a "marketing fee" or "commission" in an amount sufficient to reimburse AL Samit for AL Samit's payment of the Chellen plaintiffs' salaries while they were at the JPC facility in Tulsa. John Pickle's wife, Christina Pickle, wire-transferred approximately $81,400 per month for this purpose. The mechanism for the payments was set forth in the Proposal on Manpower Training Between AL Samit International and John Pickle Company Inc., dated September 30, 2001 (Pl.Ex. 25), and the Sales Representative Agreement dated September 27, 2001 (Pl.Ex. 26.). The Sales Representative Agreement provided that the "payment of the commission shall be made monthly for a period of two years; the duration of this agreement and will be subject to review and negotiations every six months," and the agreement was to be in force for a two-year period. (*Id.*) Likewise, the Proposal on Manpower Training contemplated a two-year period for the program. (Pl.Ex. 25.)

13. The original model for the routing of wages to the Chellen plaintiffs through a foreign business entity was set forth in documents pertaining to the JPME joint

---

4. "An I–94 Form is an alien arrival-departure record that serves as proof of the bearer's current immigration status and the time period during which his stay in this country is authorized." *Mariscal–Sandoval v. Ashcroft,* 370 F.3d 851, 853 n. 4 (9th Cir.2004).

venture between JPC and KPIOS. (*See* Pl. Exs. 9, 12.) JPC provided time sheets of the prior 20 Indian workers' hours and submitted them to KPIOS monthly; then KPIOS wire-transferred the workers' salaries in a lump sum to JPC and JPC allocated it to the workers; KPIOS (JPME) then sent JPC an invoice for the total amount of salaries and other costs to be paid to KPIOS by JPC. Although JPC's vice president and chief operating officer, Joe Reeble, used the same process in the subsequent arrangement for the Chellen plaintiffs, the subsequent arrangement was with AL Samit, a recruitment agency, not an employer or joint venture partner like KPIOS. (Tr. 88–90.)

14. JPC's Director of Manufacturing, Dale Chasteen, was responsible for approving the hire of workers for shop operations. His practice when classifying steel fabricators was to review their employment background and experience. However, he never saw or made an effort to review the qualification packets or employment histories and test results of the Chellen plaintiffs during the classification, alleged training, or evaluation processes. He admits that this information would have been important to his assessment for classification at the time of hire. (Tr. 870–72.)

15. John Holcomb, JPC's Manufacturing Support Manager, saw the Chellen plaintiffs' employment histories and prior test results. He thought they were all classified as "C" once they passed the Tulsa tests, but he admits that they were not paid what class "C" JPC employees were paid. JPC later realized that some of the Chellen plaintiffs merited a higher classification. (Tr. 1090–92.)

16. Defendants produced training materials, including a syllabus or curriculum, which they allege were to be used by the Indian nationals recruited by KPIOS who worked for JPME. (Def.Ex. 55C.) However, these materials were not used by the Chellen plaintiffs, and had no bearing on their activities. The "program" purportedly attended by the earlier Indian nationals was never implemented as to the Chellen plaintiffs. Indeed, the Chellen plaintiffs did not receive any orientation or instruction different from that given by JPC to other non-Indian newly-hired employees.

### Testing

17. Most of the Chellen plaintiffs were welders. The American Society of Mechanical Engineers ("ASME") sets standards by which welders are tested in the United States and elsewhere. There are five different welding processes which are primarily used in the fabrication of pressure vessels and related structural components as follows: SMAW (Shielded Metal Arc Welding); FCAW (Flux Core Arc Welding): GMAW (Gas Metal Arc Welding): GTAW (Gas Tungsten Arc Welding); and SAW (Submerged Arc Welding).

18. JPC required each welder in the Chellen group to be tested on welding procedures under the ASME code specifications, first in India and again in Tulsa. The Chellen plaintiffs were given the same test JPC gave to applicants for a full-time job at the Tulsa facility. Although not all of the Chellen welders initially passed all of the welding tests given at the JPC facility in Tulsa, within one week after arrival, all passed the qualifying welding test for hire of regular employees in the ordinary course of business at JPC: the 3G Flux Core Are Welding (FCAW) test. (*E.g.*, Tr. 1082, 1463–67.) Ninety percent of the production work to be performed by all JPC welders required only the 3G/FCAW capability. (Tr. 1116, 1146–47.) The positions for new hire were not all entry-level "C" classifications, but could range from "A" (the highest) to "B" and

"C" designations with commensurate pay rates. (Tr. 854–56.)

19. There was no predictable or consistent hiring practice with regard to the testing of fitters for employment at JPC. The Chellen fitters had passed the test given to them in India "as per JPC test." (*E.g.*, Pl.Ex. 18R–18W.) Defendants did not require that the fitters be "retested" when they arrived at JPC's Tulsa facility. American or non-Indian fitters who applied in the ordinary course of business for employment at JPC were sometimes hired and well-paid despite failing or doing poorly on the JPC fitter's test. (Tr. 993–96, 99–1000; *e.g.*, Pl. Exs. 61B, 61D, 611, 61K.) One non-Indian JPC fitter received a pay increase even though he received only a 2.8 rating and needed more familiarity with ASME code. (Pl.Ex. 61J.) Another non-Indian hired as a "Fitter Trainee" had vocational education, but no industry-related experience; he was paid over $10 per hour while the Chellen plaintiffs were in Tulsa. (Pl.Ex. 61K.)

### The Work

20. The welders, fitters, and roll/brake operators among the Chellen plaintiffs performed steel fabrication activities on jobs for which commercial products were made and sold to JPC customers. Indeed, the vast majority of their work time was spent on production related to job orders. (*See* Pl. Exs. 31, 31A(1) and (2).) Invoices for jobs on which the Chellen plaintiffs worked totaled over $3 million. (Pl.Ex. 67.) No jobs on which the Chellen plaintiffs worked failed to be completed in a timely manner or at an expected level of quality. (*E.g.*, Tr. 305–06.)

21. However, some of the Chellen plaintiffs' time was spent on janitorial duties, kitchen duties, cleaning the shop and yard, replacing a septic tank, converting a warehouse into the dormitory, and doing yard work for John Pickle and one other JPC officer. These job assignments would not have prepared the Chellen plaintiffs for placement and advancement within a technical trade such as steel fabrication or welding. Further, they were not the type of duties that would have been assigned, typically, to welders, fitters, and roll/brake operators although, on occasion, the lowest paid JPC employees other than the Chellen plaintiffs may have spent a minimal amount of time performing these tasks. Some of the Chellen plaintiffs' time cards reflect "refusals" to do the outside work assignments. (*See, e.g.*, Ex. 31, 31A(a); *e.g.*, Tr. 1150–52, 1179–82.)

22. JPC also assigned such duties as sandblasting, painting, and insulation work to the Chellen plaintiffs. While these duties may have assisted the Chellen plaintiffs in becoming "multi-skilled," these duties were typically reserved for the least skilled and lowest paid employees. (*E.g.*, Tr. 622023.)

23. JPC management officials, supervisors, and leadmen produced employee evaluation forms for the Chellen plaintiffs in December 2001 and January 2002 in an effort to create the appearance of a legitimate training program. (Def. Exs. 1G–48G; Pl.Ex. 66.) The evaluations included ratings and comments about the Chellen plaintiffs. The Chellen plaintiffs never saw the documents prior to this civil action, and, unlike evaluations JPC performed for its American or non-Indian employees, the evaluations for the Chellen plaintiffs were never discussed with them or signed by them. The evaluations were backdated so that it would appear plaintiffs were being assessed periodically as part of a progressive evaluation for training purposes. (Tr. 624–28, 887–88.) Some evaluations show a date of evaluation prior to the arrival date of the workers evaluated, and some show dates that were months after the last of the Chellen plaintiffs de-

parted JPC. (*E.g.,* Def. Exs. 27G, 34G, 35G, 48G.)

24. Nonetheless, the belated evaluation forms confirm that the Chellen plaintiffs performed at a level required by JPC's regular employees. The total percentage of "good" to "outstanding" ratings (3–5 numerical) for the relevant time period was 61–62%. (Pl.Ex. 66.) If "fair" ratings are included (those between 2 and 3 numerically), the percentage increases to 89%. (*Id.*) Progress for the Chellen plaintiffs from October through December was fairly insignificant. (*Id.*) Some of the Chellen plaintiffs were placed on the night shift based upon an assessment that they had good skills and an ability to work independently.

25. Although the work of the Chellen plaintiffs was not error-free, the Chellen plaintiffs required no more orientation or supervision than other new hires by JPC, and evaluators described some as requiring "little supervision." (*See* Pl.Ex. 66.) Even experienced, skilled welders and fitters and JPC employees made errors requiring repairs. (Tr. 868, 1032–33, 1149–50.) At least one JPC employee was counseled during the time the Chellen plaintiffs were at the JPC facility for taking too much time on a job (Tr. 941–43; Pl.Ex. 61G), and another was given a pay raise even though his evaluations noted time management problems that could result in man-hour overruns. (Tr. 1188–90; Pl.Ex. 61O.)

26. During the time of the purported training program, the joint production work by the Chellen plaintiffs and JPC employees had the effect of reducing the workload. Approximately 30 American or non-Indian JPC employees were displaced when their employment ended during the period of time relevant to the issues in this case. (Tr. 1085–88.) The Chellen plaintiffs not only displaced American workers, but also they encumbered positions that could otherwise have been filled by American workers. (*See* Pl. Exs. 59, 60A, 60B, 60C, 62A, 62B.)

27. JPC assigned extensive overtime work to the Chellen plaintiffs, and that also contributed to the displacement of American workers. Indeed, JPC workers complained about their loss of opportunity to work overtime hours during the time the Chellen plaintiffs worked at JPC. (*E.g.,* Tr. 622, 865–67.)

28. Despite the detriment to JPC's American workers, the benefits to defendants of this "training program" were described by Ray Murzello to the United States Consulate in Kuwait. He pointed out that the joint venture was able to obtain a manufacturing order for $1.2 million, and boasted that JPME was able to compete on equal terms against its main competitors in the region. (Pl.Ex. 10.) He later claimed that JPME had exceeded its budget targets for 2001, and had the potential to exceed much higher budget targets for 2002. (Pl.Ex. 38.) He also stated that JPC expected to benefit from larger export orders. Indeed, JPC expected to undertake an additional $70 million in project work on an annual basis as a result of its training program for the Chellen plaintiffs, in particular. (Pl.Ex. 39.)

*Living Conditions*

29. JPC converted a building at its facility into a furnished dormitory to house the Chellen plaintiffs. Yet, the Chellen plaintiffs themselves were required to work on the "conversion." The "dormitory" was basically a bunkhouse or barrack-type arrangement where partitions separated each worker's bed from another, and the bathroom from the living areas, and they shared a common living area. (*See* Pl.Ex. 3.) There was only one light switch, and one door in and out. Several Chellen plaintiffs testified or affined that they were led to believe that they would be housed in

apartments. The Chellen plaintiffs facetiously began referring to the dormitory as the "Cram-a-lot Inn." (Tr. 636.)

30. JPC deducted from the paychecks of each Chellen plaintiff fifty dollars per month for food. Yet, defendants rationed food among the Chellen plaintiffs, and inspections by the Oklahoma Department of Health revealed problems at JPC. (Tr. 317–20.) In addition, defendants were, at times, inattentive to medical needs of the Chellen plaintiffs. (Tr. 362–71.) Defendants carried no workers compensation or health insurance for the Chellen plaintiffs. (Tr. 277.)

31. Defendants restricted the ability of the Chellen plaintiffs to leave JPC because defendants kept their passports, visas, tickets, and I–94s locked in a safe, and required them to obtain permission before leaving the JPC premises. (Tr.277–78,-292–94.) JPC manager John Holcomb told the Chellen plaintiffs that they faced possible arrest, investigation, or deportation if they left the property without proper documentation. JPC also discouraged the Chellen plaintiffs from leaving by posting a notice in the dormitory that failure to obtain permission to leave could lead to return to India (Pl.Ex. 41), and posting an armed security guard at the main gate. Further, JPC even recorded some of the Chellen plaintiffs' telephone conversations without their knowledge. (Tr. 278–82.) Defendants also recruited four of the Chellen plaintiffs to be "leadmen" responsible for keeping a watchful eye over the others and reporting their activities. These leadmen signed "Personal Agreements" that used the same job description language as agreements with JPC leadmen who were not from India. (E.g., Ex. 31N; Tr. 105–10.)

### Departures from JPC

32. Beginning in November 2001, some of the Chellen plaintiffs began "unauthorized" departures from JPC. They crawled under a gate to come and go, and some never came back. Reeble required those who stayed to sign "Personal Conduct Agreements" in January 2002. (E.g., Def. Exs. 21K, 32V.) This agreement obligated the Chellen plaintiffs to "perform all the duties required of his training and any job specifically requested by his leadman, supervisor and/or JPC Management without hesitation or reservation," not to leave JPC for any "unauthorized reason," or have any communication to plan "unauthorized leave" from JPC, not to "assist or encourage any other Trainee to take any unauthorized leave from JPC," and to immediately inform John Pickle or the JPC Executive Vice President if they knew the location of those who had left, or the names of people who aided or planned to aid in the departure of any "trainee." (Id.) The agreement stated that departure from JPC was "a strict violation of your U.S. entry Visa and makes you subject to criminal prosecution." (Id.)

33. On January 28, 2002, JPC attempted to send seven of the Chellen plaintiffs back to India by way of Atlanta. Testimony indicated that this was against their will and several pleaded with JPC officials not to send them back. (Tr. 143–46, 396–98, 623–24, 1092–93.) A police or sheriff's car accompanied them to the Tulsa airport. They were very emotional as they were being driven to the airport, and fearful of returning to India under the circumstances. The INS intervened in Atlanta and prevented these Chellen plaintiffs from being sent back to India by JPC.

34. In early January 2002, the Chellen plaintiffs had submitted a complaint letter raising issues about their status with the company and the promises made to them. (Pl.Ex. 45.) One of the key issues presented was the Chellen plaintiffs' belief that they had been promised a job for two years. A videotaped meeting occurred in February 2002 during which Chellen plain-

tiff representatives indicated that the they did not understand why Reeble had told the newspapers that the Chellen plaintiffs were only in training for six months. (Def. Ex, 99; Pl.Ex. 50.) Reeble explained to the Chellen plaintiffs' representatives that JPC was in the process of submitting requests for extensions of the I–94 INS authorizations. JPC prepared the requests and sought extensions through May 2003. If the extensions had been granted, the cumulative period of "training" would have been 18 months, in contrast to the four months the prior group of 20 trainees spent at JPC in Tulsa.

35. The remaining Chellen plaintiffs left the premises on February 5, 2002, when a local man who had been assisting other Chellen plaintiffs brought vans to the JPC facility and transported them away.

### The Aftermath

36. Since leaving JPC, most of the Chellen plaintiffs have found employment with legitimate and reputable employers in the United States. (*See* Pl. Exs. 20–22, 24.) They have performed well and are paid "top" wages by industry standards. One plaintiff, for example, testified that he is making $18.75 per hour as a welder for J. Ray McDermott, Inc., a company in the petroleum industry. (Tr. 512.) His original work authorizations have been replaced by T–Visas issued under the authorization of the Bureau of Citizenship and Immigration Services ("CIS"), which is part of the Department of Homeland Security.

37. Five of the Chellen plaintiffs have taken the 6G Gas Tungsten and Shielded Metal Are Welding (GTAW/SMAW) tests given by a Certified Welding Inspector for Standby Personnel Services. (Pl.Ex. 23A–23E.) These plaintiffs passed the tests and qualified to weld according to Okla-homa and AWS standards. (Tr. 659–66.) Approximately 17 others passed the 6G or 6GR test when they applied for employment with J. Ray McDermott, Inc. This test is the most difficult welding test. (Tr. 576–78, 1471–72.) A welder who passes this test is considered highly qualified for every pipe weld position. It is improbable that the Chellen welders could have advanced from trainee to highly proficient welder in a three to four month period—the amount of time they spent at JPC. (Tr. 595.)

38. Defendants agreed, in a November 2002 agreement terminating the joint venture between JPC and KPIOS, that the recruitment and hiring of the Chellen plaintiffs "has nothing to do with and bears no relation to" KPIOS or the joint venture, nor, in fact, had their recruitment and hiring "ever been brought to the attention of or approved by the Management Committee" of the joint venture. (Pl.Ex. 70.) JPC represented that the Chellen plaintiffs were recruited and hired "by the sole act and at the sole responsibility of [JPC] and in its own name for its own account and for its own purposes." (*Id.*) John Pickle testified that this provision of the contract was untrue, but he felt compelled to sign the contract in any event because he had no alternative or choice under the circumstances: the other party had more money; he and JPC had already invested a lot a money into the endeavor; the other party was in a greater position of power; he was at a disadvantage in a foreign country which was the home country of the other party to the agreement; and the other party knew the laws of that country better than he. (Tr. 401–06.)

### Findings Related to the Reich [5] Test

#### i. Vocational School Comparison

39. The work performed by the Chellen plaintiffs was the kind of work typically

---

**5.** *Reich v. Parker Fire Protection District,* 992 F.2d 1023 (10th Cir.1993). *See* Conclusion of

done where production jobs fill the needs of customers and generate income for a business. Although defendants had a course syllabus and other training documents from its earlier training programs, these were not distributed or used with the Chellen plaintiffs. The "program" designed for the Chellen plaintiffs did not involve them in any course work, assignments, or duties typical of a vocational school trainee. In addition, it included general construction, janitorial work, kitchen duty, and other assignments unrelated to the jobs for which the Chellen plaintiffs were purportedly being trained.

40. JPC attempted to create evaluations that would be characteristic of a training program designed to develop skills within a craft. However, the evaluations were not created contemporaneously with the activities purportedly evaluated, and, in many instances, the date on many evaluation forms had no correlation to the activities or even presence of the Chellen plaintiffs. The evaluation forms were designed solely to create the appearance of a legitimate training program. Further, the evaluations were never discussed with the Chellen plaintiffs and, thus, they did not provide any information helpful to developing the skills of the Chellen plaintiffs. The manner in which the evaluations were created, in this case, means that they are not reliable indicators that JPC "training" was similar to that provided in vocational schools.

41. JPC also assigned "leadmen" from among the Chellen plaintiffs to oversee the non-work activities of all the Chellen plaintiffs. The assignment of such leadmen is not characteristic of a vocational training program. To the contrary, the Personal Agreements appointing the leadmen were characteristic of employment agreements, and contravened the terms of the Proposal on Manpower Training between JPC and

AL Samit. Similarly, the "Personal Conduct Agreements" are not indicative of something trainees at a vocational school would be required to sign, and they, too, contravene the terms of the Proposal on Manpower Training.

42. The Chellen plaintiffs were not participants of any training program that would equate to the kind of training that would be given in a vocational school.

ii. *Benefit of the Trainee*

43. The Chellen plaintiffs had extensive experience and skill in their respective trades when they arrived at the JPC facility. Indeed, they were recruited for their high level of expertise. Their qualifications would preclude them from being considered "trainees," novices, or apprentice-level workers who would have benefitted from their activities and conditions at JPC. The JPC "training program" did not serve to benefit them by teaching them new skills or improving the skills they already possessed.

44. The Chellen plaintiffs passed all the tests required by JPC and its agents in India for recruitment and selection purposes. They also met all pre-qualifying criteria that were typically required of applicants hired by JPC as employees who were paid United States wages. The required tests included the Flux Core Are Welding process test in the 3G position ("3G/FCAW"), in compliance with the ASME Sec. IX standards for welders, as well as oral and written mathematics tests and symbol-reading tests for fitters.

45. Performance by the Chellen welders of the production work required at the JPC Tulsa facility was evaluated, formally and informally, as the kind of work performed by JPC non-trainee, employee craftsmen classified as A, B, and C weld-

ers who earned well above the federally-required minimum wage. Given their proven proficiency, the alleged benefits of "training" these individuals were minimal, if any. JPC did not require the same level of qualifications, skill, experience or test results for hiring fitters, roll/brake operators, or electrical maintenance workers as it required for welders.

46. The Chellen welders, fitters, roll/brake operators, and electrical maintenance personnel were able to obtain and maintain successful employment through subsequent employers. Some JPC leadmen even recommended the Chellen plaintiffs for raises. Their prior work experience, combined with excellence shown in their employment subsequent to JPC, demonstrates that the Chellen plaintiffs were not "trained" at JPC. The program was not designed primarily to benefit the Chellen plaintiffs.

### iii. Displacement of Regular Employees

47. Although JPC hired some new employees during the time the Chellen plaintiffs were at the JPC facility in Tulsa, it fired or laid off even more. JPC's use of the Chellen plaintiffs for production, maintenance, and menial labor resulted in the displacement of JPC employees and potentially other American and non-Indian workers. The Chellen plaintiffs were competent to perform the work assigned to them at JPC, and they often worked overtime hours under minimal supervision. Indeed, American workers at JPC complained that the Chellen plaintiffs were "eating up" all the overtime.

48. Other evidence demonstrated that JPC could not have met the requirements for an H2B visa for skilled workers because it could not have shown that there were no American workers who were available and willing to work. The "training

program" resulted in the displacement of regular employees at JPC.

### iv. Impact on the Employer

49. JPC derived immediate advantage and financial gain, or the promise of contracts and increased exports, from the production work activities of the Chellen plaintiffs. In correspondence and internal memoranda, JPC's officers and managers made representations to United States consular officials expressly describing the benefits of their "training" plan as flowing to JPC and JPME. JPC boasted to United States officials that allowing the Chellen plaintiffs to work for JPC in Tulsa would permit the company to secure production contracts and increase JPC's immediate potential for expansion of its exports. JPC intended to create a competitive advantage and profit for itself by hiring the Chellen plaintiffs, who possessed specialized skills, at low wages. The Chellen plaintiffs' performance of menial tasks and duties other than welding and fitting also benefitted defendants, who would otherwise have had to pay for those services or use other JPC employees to perform them.

### v. Job Expectations Upon Completion

50. The Chellen plaintiffs were led to believe that, if they performed satisfactorily, they would have a job with JPC for at least two years. Satisfactory performance is a condition of employment whether it occurs at the end of a training period, or at the beginning. Defendants assert that they intended to send the Chellen plaintiffs to JPME in the Middle East after a six-month training period at the JPC facility in Tulsa. All of the parties intended the relationship to end in long-term employment. The Chellen plaintiffs were necessarily entitled to a job upon successful completion of the so-called training period.

### vi. *Understanding as to Wages*

51. The Chellen plaintiffs never considered themselves "trainees"; they considered themselves employees entitled to the wages promised them by defendants through JPC's agent, AL Samit. They were not familiar with United States minimum wage laws and did not anticipate that they would not be paid what other foreign nationals (on proper visas and work authorizations) are typically paid in the United States. JPC gave ambiguous and conflicting descriptions of the employment relationship to them, and defendants basically ignored their complaints or concerns about pay and working conditions. The Chellen plaintiffs' job expectations were never met.

52. Statements attributed to John Pickle by reliable witnesses demonstrated John Pickle's philosophy about possible utilization of foreign workers as cheap labor. JPC planned to implement a training program to increase production, exports, and profits for JPC and JPME by supplying the pressure vessel fabrication operation with highly skilled steel fabrication workers from India at low wages. JPC's vice-president, Joe Reeble, worked closely with Ray Murzello, JPC's marketing director, and with the full authority of John Pickle, to negotiate arrangements that would permit the defendants to pay the Chellen plaintiffs wages through third-party foreign companies. They arranged to secure the approval from United States consular authorities for issuance of business visitor B1/B2 visas which required that wages during the course of a training program not be paid by JPC, but by the foreign employer.

53. AL Samit was defendants' agent. The agency was established by defendants' contract with AL Samit to be the recruitment agency and a partner in selection and hire of Indian nationals. In addition, JPC officials and AL Samit jointly conducted meetings with Chellen plaintiffs.

54. Although the Chellen plaintiffs signed documents which contain the word "trainee," they did not intend to be treated as JPC trainees exempt from minimum wage. The documents presented to the Chellen plaintiffs at the last minute in India were apparently an attempt by defendants to have the Chellen plaintiffs waive their federal rights to minimum wages.

55. Ironically, defendants contend that the document signed by John Pickle terminating the joint venture with KPIOS is untrue to the extent it indicates that defendants' recruitment and hiring of the Chellen plaintiffs had no relation to the joint venture or KPIOS. John Pickle essentially asserts that he signed the termination agreement under duress. The duress John Pickle experienced, if any, was similar to that experienced by the Chellen plaintiffs when they were asked to sign the offer letters and statements of understanding prior to their departure from India. The intent of the parties was not premised on a mutual understanding that they were entering into a purely trainer/trainee relationship.

56. The misunderstanding as to wages is also evidenced by the "unauthorized" departures by the Chellen plaintiffs from the JPC facility beginning in November 2001 and ending in February 2002. Their reasons were: less pay than expected, food rationing, substandard living conditions, menial labor, job assignments outside their craft, restrictions on freedom of movement, threats of deportation and prosecution, physical threats, and verbal abuse. These are not the characteristics of a legitimate work training program. The Chellen plaintiffs' expressed discontent over the terms and conditions of their work demonstrates a lack of mutual understand-

ing as to their wages, employment expectations, and status.

57. The EEOC presented testimony at trial of three experts on exploitation of workers, circumvention of immigration laws, and human trafficking. The Court considered this testimony relevant only as to the character and nature of the working relationship between the parties. One expert described human trafficking practices in India and South Asia similar to those utilized by defendants and AL Samit in recruiting the Chellen plaintiffs. (*See* Tr. 760–838.) An immigration expert explained defendants' option in obtaining visas, and the significance of their choice to obtain B1/B2 visas for the Chellen plaintiffs. He concluded that JPC did not meet the requirements for the visa options available to it for trainees. (*See* Tr. 1275–1308.) EEOC's third expert testified, among other things, that the Offer Letter, although referencing the workers as "trainees," included payment of wages, which would not be characteristic of a bona fide training program. (*See* Tr. 1319–1349.)

## CONCLUSIONS OF LAW

Any finding of fact which is more appropriately characterized as a conclusion of law is incorporated herein.

1. To determine whether the Chellen plaintiffs were entitled to compensation as "employees," or as "trainees" to whom minimum wage and overtime are not due under the FLSA, the Court considers the broad statutory definitions of "employee" and "employ." "Employee" is defined as "any individual employed by an employer," 29 U.S.C. § 203(e)(1). To "employ" means "to suffer or permit to work," *id.* § 203(g). These definitions include all individuals employed by covered employers and impose no limitation based on nationality or immigration status. *See Patel v. Quality Inn South,* 846 F.2d 700, 706 (11th Cir.

1988) (undocumented East Indian workers considered employees for purposes of coverage under the FLSA); *cf. Donovan v. Burgett Greenhouses, Inc.,* 759 F.2d 1483, 1486 (10th Cir.1985) (employer required to pay wages, including overtime for work performed by illegal aliens).

2. The Tenth Circuit has followed *Walling v. Portland Terminal Co.,* 330 U.S. 148, 149–50, 67 S.Ct. 639, 91 L.Ed. 809 (1947), by adopting the six-factor test developed by the Wage and Hour Division of the Department of Labor ("DOL") for determining whether workers are to be considered "trainees" or "employees" under the FLSA:

[i.] The training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school[;]

[ii.] The training is for the benefit of the trainee[;]

[iii.] The trainees do not displace regular employees, but work under close observation[;]

[iv.] The employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded[;]

[v.] The trainees are not necessarily entitled to a job at the completion of the training period[; and]

[vi.] The employer and trainees understand that the trainees are not entitled to wages for the time spent in training.

*Reich v. Parker Fire Protection District,* 992 F.2d 1023, 1026 (10th Cir.1993) (quoting the Wage & Hour Manual (BNA) 91:416 (1975)). The *Reich* test is based upon a "totality of the circumstances," and the Court looks at the "economic realities

of the relationship." *Id.* at 1027. No one factor is dispositive. *Id.*

 3. "A principal-agent relationship may be grounded in a formal arrangement or may be inferred from 'conduct which shows that one is willing for the other to act for it, subject to its control, and that the other consents so to act'." *St Anthony Hosp. v. U.S. Dept. of Health and Human Servs.,* 309 F.3d 680, 703 (10th Cir.2002) (citations omitted). Representations made by John Pickle and/or AL Samit's agents or subagents are attributable and imputed to the defendants. *See Marshak v. Blyth Eastman Dillon & Co., Inc.,* 413 F.Supp. 377, 379 (N.D.Okla.1975).

 4. "In Oklahoma, economic duress allows a party to avoid a contract that it has entered if a 'wrongful act [of the other party was] sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.'" *Strickland Tower Maintenance, Inc. v. AT & T,* 128 F.3d 1422, 1426 (10th Cir.1997) (citation omitted). However, "[a] litigant cannot [ ] make out a claim of economic duress by alleging merely that the opposing party took advantage of [his] weak negotiating position or because of 'business necessities.'" *Id.* (citations omitted). The Chellen plaintiffs signed the Offer Letter and Undertaking under duress.

 5. Based on Findings of Fact Nos. 39–57, the Court concludes that the Chellen plaintiffs were "employees" under the FLSA and the *Reich* test, based on the totality of the circumstances and the economic realities of the relationship.

 6. As a matter of law, federal rights to minimum wages cannot be waived by contract or other agreement. *See Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 302, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 740, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *see also Marshall v. Quik-Trip Corp.,* 672 F.2d 801, 806 (10th Cir. 1982).

 7. In addition to the *Reich* factors, both parties urge the Court to examine other tests to determine whether a plaintiff is an employee or trainee under the FLSA. The EEOC cites to *Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (reviewing the issue in the context of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101 *et seq.*) for factors evidencing a common law test for determining the existence of an employment relationship.[6] While most, if not all, of these factors might weigh in favor of plaintiffs, the *Darden* court specifically noted that "the textual asymmetry between the two statutes precludes reliance on FLSA cases when construing ERISA's concept of 'employee.'" *Id.* at 326, 112 S.Ct. 1344.

---

6. "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Darden,* 503 U.S. at 323, 324, 112 S.Ct. 1344 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

8. The EEOC also urges the Court to consider *Bureerong v. Uvawas,* 922 F.Supp. 1450 (C.D.Cal.1996), where the court examined the employee/trainee issue in the context of allegations of involuntary servitude and false imprisonment. There the court determined that traditional tests for determining an employer-employee relationship under the FLSA were not controlling, but that an assessment based on the "economic realities" standard would be most appropriate. *Id.* at 1467–69; *see Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961). The Court's consideration under *Reich* incorporates consideration of the "economic realities" present in this matter as well as plaintiffs' allegations of involuntary servitude. *Bureerong* adds little to the analysis.

9. Finally, the EEOC urges the Court to consider this matter by reference to the Trafficking Victims Protection Act, 22 U.S.C. § 7101 *et seq.* (2000), and certain federal criminal statutes, 18 U.S.C. §§ 1592, 1589. However well the facts of this case may appear to fit within the definitions or prohibitions of these statutory provisions, the issue before this Court involves violations of the FLSA. Any evidence probative of human trafficking is relevant only to the extent it tends to show that the Chellen plaintiffs were employees—not trainees—of JPC.

10. The defendants urge the Court to consider a "hybrid economic reality/control test" under the Equal Employment Opportunity Act (Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*) used to determine whether a plaintiff is an employee for Title VII purposes. "This test requires the court to ask if a plaintiff claiming to be an employee is, as a matter of economic reality, dependent upon the business to which he renders service and to what extent the 'employer' controls the work of the 'employee.'" *St. Germain v. Simmons Airline,* 930 F.Supp. 1144, 1146 (N.D.Tex. 1996). Although the Court has already dismissed the Chellen plaintiffs' Title VII claim, it finds that, as a matter of economic reality, the Chellen plaintiffs were dependent upon JPC and JPC controlled almost every aspect of their work. Most of the additional factors set forth in *St. Germain,* other than the fact that JPC did not withhold social security taxes or provide retirement benefits, also counsel in favor of plaintiffs.[7]

11. Defendants emphasize that the Chellen plaintiffs, as holders of B1 or B2 visas, were not authorized or eligible to be employed for wages in the United States. *See Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (no award of backpay to an undocumented alien). If the Chellen plaintiffs were not authorized to work in the United States, they may not be entitled to backpay. *Id.* at 140, 151, 122 S.Ct. 1275. However, such an argument goes to the remedies available to the plaintiffs, not

---

7. These include:
(1) the kind of occupation with reference to whether the work is usually done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, *i.e.,* by one or both parties, with or without notice or explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business; (9) whether the work accumulates retirement benefits; (10) whether the employer pays social security taxes, and (11) the intention of the parties. *Id.* at 1146–47 (quoting *Diggs v. Harris Hospital-Methodist,* 847 F.2d 270, 272 (5th Cir. 1988)).

to the issue of whether the Chellen plaintiffs were, in fact, employees under the FLSA. Indeed, undocumented aliens may be considered employees under federal labor law. *See Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 892, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (finding that the National Labor Relations Act applies to unfair labor practices committed against undocumented aliens.)

12. The Court's determination is based upon the DOL factors, the totality of the circumstances, and the economic realities considerations set forth in *Reich.* Consideration of other "tests" or factors adds little or nothing to the analysis, and certainly does not change the outcome.

### SUMMARY

In this phase of the proceedings, the Court finds that the Chellen plaintiffs were employees, and not trainees, under the FLSA. Although defendants' actions evidence an intent to evade the minimum wage requirements of the FLSA, the Court leaves for phase two a determination as to whether defendants' "arrangements were conceived or carried out in such a way as to violate the letter and spirit of the minimum wage law. . . ." *See Walling,* 330 U.S. at 153, 67 S.Ct. 639. For that purpose, the Court sets a scheduling conference for September 13, 2004, at 1:30 p.m.