(144 P.3d 760)
No. 93,477

A.O. SMITH CORPORATION, *Appellee/Cross-appellant*, v. KANSAS DEPARTMENT OF HUMAN RESOURCES and GREGG A. ALLEN, *et al.*, *Appellants/Cross-appellees*.

Opinion filed December 9, 2005.

*Glenn H. Griffeth* and *Heather Wilke*, of Kansas Department of Labor (formerly Kansas Department of Human Resources), for appellant/cross-appellee Kansas Department of Labor.

*Ross A. Hollander*, of Joseph & Hollander, PA, of Wichita, for appellants/cross-appellees, Gregg A. Allen, *et al.*

*Patrick B. Hughes*, of Adams & Jones, Chartered, of Wichita, *Timothy G. Costello*, of Krukowski & Costello, S.C., of Milwaukee, Wisconsin, *Kenneth J. Maciolek*, of A.O. Smith Corporation, and *Elliot H. Shaller*, of Krukowski & Costello, P.C., of Washington, D.C., for appellee/cross-appellant.

Before RULON, C.J., GREENE and BUSER, JJ.

GREENE, J.: This appeal reviews a final action by the Kansas Department of Human Resources (KDHR) concluding that A.O. Smith Corporation (AOS) willfully violated the Kansas Wage Payment Act (KWPA), K.S.A. 44-312 *et seq.*, by failing to pay former employees for accrued vacation time. AOS appealed to district court, which affirmed KDHR's order to pay the accrued vacation plus interest but reversed KDHR's imposition of penalty under the statute. We reverse the district court's reversal of penalty, affirm the KDHR's final action, and remand with directions.

*Factual and Procedural Overview*

AOS is a Delaware corporation headquartered in Milwaukee, Wisconsin, which purchased a manufacturing facility and related business in Parsons, Kansas, in 1995. At the time of acquisition, the former plant owner had an "earn-in-arrears" vacation policy, where employees earned vacation for work in the current year but were permitted to use that vacation in the following year. AOS assumed this policy but claims that it first attempted to change the policy in 1997, transitioning to a "pop-up policy," wherein employees could take vacation in the year earned or in subsequent years, based on the number of years of service. The human resource manager at the Parsons plant, however, testified that the 1997 policy did not change the policy in practice and that employees continued to earn in the current year for vacation to be taken in the following year.

Beginning in January 1999, the policy changed or was clarified to provide that employees actively employed on January 1, 1999, earned vacation on that date and could use their vacation anytime during the 1999 calendar year. Again, AOS contended that this was a "pop-up" policy because the vacation was earned for the entire year merely through being employed on January 1 of that year. This policy was reflected in an employee handbook dated January 1, 2000.

In early 2000, AOS decided to work toward a divestiture of the Parsons plant and as a part of that decision determined that the existing pop-up vacation policy should be changed to an "earn-as-

you-go" policy to achieve compatibility with industry preference. Although a new policy was issued in December 2000 dated June 1, 2000, the local human resources manager was directed not to post or communicate the new policy to employees.

During negotiations for a sale of the facility with CST Industries, AOS advised that its position was there was no outstanding vacation liability at the plant in light of the new vacation policy. Although CST initially stated that it would not accept anything but a termination and rehire of AOS employees, AOS successfully negotiated the sale of the facility to CST, together with retention of nearly all of the plant employees at the same jobs, for the same rates of pay, and for nearly identical benefits. The issue of accrued vacation payable was prominently discussed during negotiations, and AOS asked that CST not promote its concerns about this issue to the employees. Ultimately, the asset purchase agreement provided that AOS employees would be eligible to take vacation from CST in 2001 under CST's vacation policy based upon their years of service with AOS and that AOS would indemnify and hold CST harmless for any accrued vacation liability.

Within a couple of days of CST's acquisition of the plant, employees were advised of CST's earn-as-you-go vacation policy. Based upon inquiries and complaints from the employees, CST determined its vacation policy was a significant change from what employees believed they had with AOS. On January 22, 2001, AOS sent correspondence to some employees explaining the change in the vacation policy that purportedly occurred in June 2000 and asked CST to post this response at the Parsons plant. In June 2001, former employees of AOS began filing claims for wages under the KWPA with the KDHR. The claims were solely for vacation pay accrued during 2000 eligible for taking or compensation in 2001.

In June 2003, after a formal evidentiary hearing, the presiding officer for KDHR, Douglas Hager, issued a comprehensive initial order. In his factual findings, the presiding officer determined that although a vacation policy was issued by AOS effective January 1, 1997, the policy was "confusing, ambiguous and contradictory" and did not effectively change its administration as an earn-in-arrears policy. Similarly, the 1999 policy reflected in the 2000 employee

handbook was also administered to confer vacation benefits as payment for prior service. The presiding officer found that AOS discovered a discrepancy between its corporate vacation policy and that effective at the Parsons plant in April 2000. This triggered efforts in late 2000 to change the Parsons plant's policy to an earn-as-you-go policy, but the presiding officer found there was no credible evidence that the company ever advised employees of the 2000 change of vacation policy until after the sale.

In his conclusions of law, the presiding officer found that a "discharge" under the KWPA involved any separation from the employer, regardless of subsequent re-employment of the workers. In reviewing AOS employment policies, the presiding officer found that the company regularly paid employees for unused accrued vacation upon their departure from employment, making such liabilities "wages" under the KWPA. Finally, the presiding officer found evidence that AOS's failure to pay accrued vacation was "willful." Accordingly, the presiding officer ordered Respondent to pay $370,798.43 in wages, $94,953.55 in interest, and a $366,552.28 statutory penalty to the claimants. The initial order was adopted by KDHR as the agency's final action in August 2003.

AOS filed a petition for judicial review in district court, and after argument and briefing, the district court issued its memorandum decision and order. The district court deferred to KDHR's interpretation of the statute and concluded the claimants were discharged from their employment with AOS, notwithstanding their immediate re-employment with CST, and that accrued vacation was "wages" under the KWPA. The district court also agreed with KDHR that, despite conflicting evidence regarding AOS's vacation policy at the Parsons plant, there was substantial evidence that the policy in practice at the Parsons plant was that employees earned vacation time in one year to be utilized in the next.

With respect to KDHR's assessment of a statutory penalty, the district court reversed, finding that the evidence established AOS took "positive action to protect its employees during the negotiations leading to the sale." Citing public policy favoring the continued employment of workers, as reflected in the unemployment compensation statute, and AOS's efforts to ensure CST would be

obligated to offer employment to nearly all the plant workers, the court concluded public policy weighed in favor of AOS. Accordingly, the district court affirmed KDHR's decision finding AOS had failed to pay claimants' earned wages under the KWPA but reversed the imposition of a penalty under K.S.A. 44-315(b).

The KDHR and claimants appeal the reversal of penalty. AOS cross-appeals the order to pay accrued vacation plus interest.

*Standards of Review*

In reviewing the district court's actions in such matters, we must first determine whether the district court observed the requirements and restrictions placed upon it by the statute and then apply the same standards as the district court in reviewing the administrative tribunal's action. *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, Syl. ¶ 2, 630 P.2d 1131 (1981).

The standards of review applicable to judicial review of agency actions are specified in K.S.A. 77-621 and require the court to grant relief where, *inter alia*, the agency has erroneously interpreted or applied the law, has engaged in an unlawful procedure or has failed to follow prescribed procedure, or has made a determination of fact that is not supported by evidence that is substantial when viewed in light of the record as a whole. K.S.A. 77-621(c)(4), (5), and (7). The statute also requires us to grant relief where the agency action is otherwise unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(8); see *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 474, 749 P.2d 21 (1988).

Interpretation of a statute is a question of law over which this court exercises unlimited review. *Matjasich v. Kansas Dept. of Human Resources*, 271 Kan. 246, 250-51, 21 P.3d 985 (2001). Because this appeal involves in part the interpretation of statutory language by an administrative agency, the doctrine of operative construction is applicable. Under this doctrine, "the interpretation of a statute by an administrative agency charged with the responsibility of enforcing the statute is entitled to judicial deference." The doctrine is not without limits because the prior agency determination, "while persuasive, is not binding on the court." 271 Kan. at 250.

*Did KDHR Err in Construing and Applying K.S.A. 44-315(a) in Determining that the Employees Were "Discharged" under the Act?*

In its cross-appeal, AOS challenges the decisions of KDHR and the district court in determining that its sale but protection of employee jobs constituted a "discharge" for purposes of K.S.A. 44-315. We address the cross-appeal first because of its potential to render moot the appeal of KDHR and employees.

The pertinent statute provides in relevant part:

"Whenever an employer *discharges* an employee or whenever an employee quits or resigns, the employer shall pay the employee's *earned wages* not later than the next regular payday upon which he or she would have been paid if still employed . . . ." (Emphasis added.) K.S.A. 44-315(a).

The term "wages" is defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or *other basis* less authorized withholding and deductions." (Emphasis added.) K.S.A. 2005 Supp. 44-313(c). KDHR's regulations provide that the phrase "other basis" includes "all agreed compensation for services for which the conditions required for entitlement, eligibility, accrual or earning have been met by the employee." K.A.R. 49-20-1(d). Accordingly, we have held that where an employer's policies provide for payment of unused accrued vacation time upon termination, that payment constitutes wages under the KWPA. *Dillard Dept. Stores, Inc. v. Kansas Dept. of Human Resources*, 28 Kan. App. 2d 229, 233, 13 P.3d 358 (2000).

AOS initially argues that it did not "discharge" employees because it protected all jobs upon sale to CST. AOS relies in part on an entire body of federal case law construing and applying federal law and holding that employees hired by a successor company are not "laid off" for purpose of triggering severance obligations of predecessor employer. See, *e.g., Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1146-48 (4th Cir. 1985), *aff'd Brooks v. Burlington Industries, Inc.,* 477 U.S. 901 (1986). We distinguish this line of case law principally for two reasons. *First,* severance and pension benefit plans serve distinctly different functions than wage

payment statutes. Severance pay policies generally serve two ob-
jectives: (1) to protect employees from the economic hardship of
joblessness and (2) to reward employees for past service. See, *e.g.,*
*Bradwell v. GAF Corp.*, 954 F.2d 798, 801 (2d Cir. 1992). *Second,*
most of these cases turn on specific language in a defined benefit
plan, and none construe and apply the term "discharge." We agree
with the hearing officer's meticulous distinction of these cases:

"Each of the cases cited by [AOS], however, turned on the specific language
used in the severance agreements in question for its outcome. *See, e.g., Harper
v. R.H. Macy & Company, Inc.*, 920 F.2d 544, 545 (8th Cir. 1991)(holding that
employees who continued working without interruption on comparable terms for
purchaser of their employer's business were not 'permanently terminated' as that
term was used in an employee welfare benefit plan which required payment of
severance benefits when '[an employee is] permanently terminated or laid-off for
periods that exceed 90 days'); *Bradwell v. GAF Corporation*, 965 F.2d 798, 800
(2d Cir. 1992)(holding that employees who retain their jobs under a plant's new
owner are not entitled to severance pay from the plant's former owner under plain
language of company severance pay policy which provided that only employees
'permanently laid off because of lack of work' are entitled to severance benefits);
*Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1142 (4th Cir. 1985)(hold-
ing that it was not arbitrary or capricious for lower court to deny severance pay
where employer sold two plants and buyer offered employment to virtually all
employees where severance pay benefits were payable upon 'job elimination' and
plan was primarily intended for employees who suffered period of unemploy-
ment); *Rowe v. Allied Chemical Hourly Employees' Pension Plan*, 915 F.2d 266,
269 (6th Cir. 1990)(holding that employees' separation from Allied's employment
by sale of plant and immediate reemployment with successor did not entitle em-
ployees to benefits where plan provided benefits only in event of a 'layoff'); *Sejman
v. Warner-Lambert Company, Inc.*, 889 F.2d 1346 (4th Cir. 1989)(holding that
employees of successor company not entitled to severance pay benefits from for-
mer employer's plan where to be eligible for severance pay benefits a claimant
had to be both an employee of the company and terminated by the company;
interpretation upheld that severance pay policy excluded from definition of job
termination those who continued working for successor at same job, in same
facility, at same tasks for comparable compensation and benefits); *Mathis v. Su-
perior Supply Company*, 1988 WL 130668 (D. Kan.)(holding that employees who
continued to work for successor company in same facility with same titles and
same pay were not entitled to severance pay where selling company's plan pro-
vided that severance would be paid to employees who were terminated through
company-initiated action for reasons other than nonperformance, gross miscon-
duct and disability). The decisions reached in these matters were based on sev-
erance pay agreement language providing specifically that severance pay was only

due in event of permanent job loss and the like. As such, the presiding officer finds them to be of little support to Respondent's blanket assertion that their former employees were not discharged by the employer within the meaning of the Kansas Wage Payment Act.

"Respondent also urges that regulations and case law interpreting the Worker Adjustment and Retraining Act, ('WARN'), codified at 29 USC § 2101, provide another analogy that may be useful in determining whether under the instant facts claimants were 'discharged' from employment within the meaning of the Kansas Wage Payment Act. In view that a WARN notice is triggered only by a covered employment loss, 20 C.F.R. § 639.6, the analogy is of little persuasive value to the resolution of this dispute. Based upon its legislative history, courts have held that the intent of Congress for using the term 'employment loss' to trigger WARN's notice requirements was 'to cover only employees truly idled or deprived of income.' *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1280 (10th Cir. 1994)."

AOS has also cited and relied heavily on this court's opinion in *Safelite Glass Corp. v. Fuller*, 15 Kan. App. 2d 351, 807 P.2d 677, *rev. denied* 249 Kan. 776 (1991). *Safelite*, however, was not a wage payment case. In *Safelite*, the district court found that an employee with a noncompete agreement had been terminated when his employer assigned its assets to a subsidiary and, accordingly, the noncompete agreement was void. On appeal, this court held that valid covenants not to compete were generally assignable and the facts of the case supported the assignability of the employee's agreement. In summarizing its ruling, the court stated: "We conclude Fuller's continued employment by Safelite in the same position and at the same salary did not constitute a termination of employment." 15 Kan. App. 2d at 352-63. Clearly, the court was determining the intent of the parties under the terms of a particular contract, and its holding has no application to litigation under the KWPA. The case does not stand for any broad definition of "terminated" or "discharged" under Kansas law and certainly does not construe state statutes regulating employment relationships.

We recognize that AOS employees retained their jobs at identical compensation and benefits, but it is beyond dispute that they were no longer employed by AOS, but rather by its successor in interest, CST. If we were to construe the Act as urged by AOS, employees would have no statutory right to payment of wages due from an employer for the period immediately prior to an asset

purchase transaction like that here. This construction would not be consistent with the purpose of the KWPA, which is to protect low-income workers from the abuses of employers. See *Morton Bldgs. Inc. v. Dept of Human Resources*, 10 Kan. App. 2d 197, 199, 695 P.2d 450, *rev. denied* 237 Kan. 887 (1985); Byers & Rumfelt, *See Dick and Jane Work: A Kansas Wage Payment Act Primer*, 72 J.K.B.A. 14-15 (Oct. 2003) (citing 1973 Senate Committee on Public Health and Welfare hearing on H.B. 1429). AOS's construction would create an unintended loophole in the statute, allowing employers to sell existing businesses and escape liability for any wages remaining due employees on the effective date of the sale. AOS has cited no authorities to suggest that statutory wage payment liability should be dependent upon continued employment by a successor employer, and we decline to so hold.

The agency's interpretation of the statute is entitled to deference where the agency has provided a rational basis for the agency's interpretation. See, *e.g., Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 810, 667 P.2d 306 (1983). We hold that the agency's construction and application of K.S.A. 44-315, concluding that employees are "discharged" under the statute despite identical employment by a successor employer, are rationally based and consistent with the legislative purpose underlying the statute. We agree with the district court, which concluded that no error was committed by the agency in holding that AOS's sale of the Parsons plant to CST resulted in a "discharge" of its employees for purposes of liability assessment under K.S.A. 44-315.

*Did KDHR Err in Construing and Applying AOS's Vacation Policy as of the Effective Date of Sale?*

AOS next contends in its cross-appeal that if there was a discharge, (1) its "earn-as-you-go" policy issued in December 2000 was in effect and thus there was no earned vacation payable as of January 10, 2001, (the effective date of sale) and (2) none of its various vacation policies obligated it to pay for earned vacation if the plant was sold. Although AOS contends that our standard of review is unlimited in construing its written vacation policy (citing

*Dillard Dept. Stores*, 28 Kan. App. 2d at 234), we conclude that there were factual disputes bearing on this issue and thus we view the issue as a mixed question of fact and law. To the extent that factual findings are critical to resolution of the issue, we must determine whether the agency's fact findings are supported by evidence that is substantial when viewed in light of the record as a whole. K.S.A. 77-621(c)(7).

The presiding officer found that notwithstanding AOS's argument regarding differences in various policies in effect, all AOS's vacation policies were implemented in the same fashion and the policy in practice was not an earn-as-you-go policy. The presiding officer also concluded the policy issued in late 2000 did not go into effect because the employees were not notified of the policy until after the sale. The district court concluded that due to the conflicting evidence surrounding AOS's vacation policy at the Parsons plant, the presiding officer's factual findings were supported by the record and his legal conclusions were sound. We agree. The presiding officer summarized his findings on this issue as follows:

"Under the vacation policy in place at the Parson, Kansas facility at the time of its 1995 acquisition by Respondent, vacation time was earned in arrears. As a condition precedent to the earning of vacation under this policy, an employee worked for a year from his hire date and 'earned' vacation on his seniority date. Although Respondent's corporate vacation policy was an 'earn-as-you-go' policy, Respondent made no attempt to change the ESPC division's vacation policy to an 'earn-as-you-go' policy upon its acquisition in 1995. This was so, according to Respondent's Vice President O'Connor, because Respondent 'made it a habit . . . not to immediately implement [AOS] polic[ies] or benefits across the board.' Rather, Respondent 'incrementally implement[s] changes in benefits and policies as [they] go.'

"On January 1, 1997, when Respondent issued a written vacation policy for ESPC employees, the date for awarding vacation was changed from each individual employees' seniority date to a fixed date for all employees, January 1 of each year. The January 1, 1997 policy retained the provision that vacation was earned for working the complete prior year for use in the following year. Moreover, adoption of the new policy did not change administration of ESPC's vacation policy from that of an 'earn-in-arrears' methodology. Although management of the facility considered a change to an 'earn-as-you-go' approach, which would have resulted in employees receiving the prior year's earned vacation and the current year's 'earn-as-you-go' vacation in the same year, this option was rejected because of the additional cost it would have entailed.

"Respondent's next written vacation policy was issued in its January 1, 2000 Employee Handbook. This policy was distributed to employees of the facility in calendar year 2000. This policy, like those that preceded it, required an employee to work for a year before receiving vacation on each January 1. Regardless of the label attached to such a policy, working for a year continued to constitute a condition precedent to earning vacation wages on January 1 of each year. . . .

. . . .

"When an employee is made aware of company policy, as is presumed here by Respondent's promulgation and distribution of it's January 1, 2000 Employee Handbook, the employee will be bound by the terms thereof. *Sweet v. Stormont Vail Regional Medical Center*, 231 Kan. 604, 611 (1982). . . .

. . . .

"Respondent asserts, in effect, that it modified its employment agreement with claimants by adoption of an 'earn-as-you-go' vacation policy on June 1, 2000. Even if this be accepted as true, by its own admission, Respondent's new vacation policy was not effective for current employees until January 1, 2001, the date upon which its employees were deemed to have earned vacation by working the preceding year. Moreover, Respondent's contention that it changed its vacation employment agreement with claimants by adopting an 'earn-as-you-go' policy on June 1, 2001, is not supported by the record of this matter. By working through the calendar year 2000, claimants gave consideration for Respondent's promise of a year's vacation prior to being given any notice of Respondent's purported change in policy. Respondent's contention that it modified the claimants' employment agreements by changing vacation policy without notice after claimants had given a year of service in consideration of the promised January 1, 2001 vacation time is without merit."

We agree with the presiding officer on the unenforceability of the unpublished policy. AOS was not entitled to change its policy without notice to its employees under these circumstances. An employer may impose a cut in wages *if* the change is announced before any wages are earned. *Salon Enterprises, Inc. v. Langford*, 29 Kan. App. 2d 268, 271, 31 P.3d 290 (2000); *Alkire v. Fissel*, 23 Kan. App. 2d 487, 493-95, 932 P.2d 1034, *rev. denied* 262 Kan. 959 (1997). In the case of nonsalary wages such as vacation pay, they become wages when "the conditions required for entitlement, eligibility, accrual or earning have been met by the employee." K.A.R. 49-20-1(d). More importantly, even if AOS had effectively adopted and communicated the policy issued in late 2000, it provided that vacation was earned on January 1, 2001. In addition, that policy explicitly provided that if an employee retired, died, or

lost employment "as a result of job abolition, the vacation payment will be made based on the assumption that the employee has earned vacation benefit for the entire year."

AOS argues that the agency's construction of its vacation policies results in a "double-dip" by employees. Because the successor employer, CST, assured the employees vacation in 2001 pursuant to its earn-as-you-go policy, AOS argues that the employees lost no vacation in 2001 and that to order they receive vacation from both AOS and CST doubles what they expected for vacation in 2001. At first blush this argument may seem logical, but it does not withstand scrutiny and must be rejected. If AOS employees were due vacation in the year 2001 from AOS as a result of their work in the year 2000, this obligation cannot be fulfilled with vacation earned for working for CST in 2001; as the employees argue, they have lost a year of vacation "somewhere." Indeed, the only reason for double vacation entitlement in the year 2001 is that the sale to CST finally and effectively changed the policy to one of current entitlement rather than future entitlement. This is best explained by a hypothetical example: if AOS had shut down the plant on January 10, 2001, its employees would have been due their accrued vacation from 2000; their subsequent employment by any other employer with an earn-as-you-go vacation policy is irrelevant to the accrued obligation of their prior employer.

Regardless of the policy in effect, each current employee of AOS had earned vacation as of the time of the sale of the plant to CST on January 10, 2001. We conclude that the agency's findings are supported by evidence that is substantial when viewed in light of the record as a whole and that its construction of AOS's operative vacation policy was not erroneous as a matter of law.

*Did the Agency Err in Characterizing the Withholding of Accrued Vacation Pay as "Willful," Thus Supporting the Assessment of a Penalty Under the Statute?*

KDHR and the employees challenge the district court's reversal of the agency's assessment of a penalty against AOS based upon a finding that its withholding of accrued vacation pay was "willful" under the KWPA. This is generally a question of fact to be deter-

mined by the trier of fact. *Holder v. Kansas Steel Built, Inc.*, 224 Kan. 406, 411, 582 P.2d 244 (1978). Accordingly, we must determine whether the agency's finding of fact is supported by evidence that is substantial when viewed in light of the record as a whole. K.S.A. 77-621(c)(7).

A penalty is assessed under the KWPA only if "an employer willfully fails to pay an employee wages" as required by the wage statutes. K.S.A. 44-315(b). " 'A willful act is one indicating a design, purpose, or intent on the part of a person to do wrong or to cause an injury to another.' " *Holder*, 224 Kan. at 411. Whether there is a genuine controversy or honest dispute about wage obligation is not controlling under current KWPA statutes. *Holder*, 224 Kan. at 410.

The presiding officer not only found as a matter of fact that AOS's "failure to pay the vacation wages here in dispute was willful as that term is used in applicable Kansas law," he cited Supreme Court authority for the definition of willful act under the statute as "one indicating a design, purpose, or intent on the part of a person to do harm or to cause an injury to another" and explained his rationale as follows:

"The entire course of Respondent's conduct from the time it began implementing changes in vacation policies in 1997 through Respondent's surreptitious attempt to change its vacation policy by its December 13, 2000 e-mail right on through the time of sale and Respondent's subsequent attempts to convince employees that they had lost no vacation time is suggestive of a calculated attempt to 'do wrong'. However, the single event the presiding officer finds most troubling and most indicative of a willful violation of the Act took place during negotiations for sale with CST. CST Vice President Stier's credible testimony indicated that Respondent expressed a concern that the purchaser would 'promote' this very vacation wage liability issue with its soon-to-be-former employees and received CST's assurances that it would not 'encourage any activities along these lines'. Based upon all facts of the record, it is the finding and conclusion of the presiding officer that the totality of Respondent's actions in this matter indicated a design and purpose to wrongly withhold vacation wages earned as of January 1, 2001 by claimant employees and payable upon their separation from Respondent's employment which occurred by virtue of Respondent's January 10, 2001 sale of ESPC division. Penalty shall be assessed in accordance with statute. K.S.A. 44-315(b)."

The district court reversed the assessment of a penalty for the following reasons:

"Based on the evidence presented in this case, the Court finds that the award of the actual wages in the amount of $370,798.43 plus interest pursuant to K.S.A. 44-323(a) will adequately compensate the claimants in this case. Moreover, the Court finds that the uncontroverted evidence regarding the steps taken by A.O. Smith to protect its employees during the sales negotiations with CST Industries serves to negate the allegations of a 'design, purpose, or intent' by the Petitioner 'to do wrong or to cause an injury' to the claimants. As the Administrative Hearing Officer found, the claimants 'continued working in the same jobs, at the same pay rate with substantially the same benefits, and with all of their years of service recognized for purposes of calculating their vacation and benefits.' Thus, the Court finds that the actions taken by A.O. Smith to make sure none of its employees lost their jobs when the factory was sold promoted stability and continuity of employment in furtherance of the public policy of the State of Kansas.

. . . .

"In addition to the above, the record reveals, and the Administrative Hearing Officer found, that there was a great deal of confusion regarding the implementation and interpretation of the A.O. Smith vacation policies. After the sale was completed, A.O. Smith attempted to clear up the confusion by providing written answers to questions for its former employees. The fact that A.O. Smith was willing to indemnify the purchaser for any potential vacation wage liability and was willing to stipulate with the claimants regarding the amount of vacation pay due should the company fail to prevail on its legal arguments, supports the position that the Petitioner believed in good faith that it had modified the vacation policy in June of 2000. There is also substantial evidence in the record that A.O. Smith representatives believed that the attempted change in vacation policy would not adversely affect current employees since they had been able to take their vacations in 2000 and would still be able to take their vacations from CST Industries in 2001.

"As the Administrative Hearing Officer also found, A.O. Smith had a legal right to change its vacation policy. Although the type of confusion noted by the Administrative Hearing Officer may constitute negligence or carelessness on the part of A.O. Smith, the court does not find that 'confusion' constitutes willfulness as that term is defined by Kansas Law. To punish A.O. Smith under the facts presented would send a negative message to other Kansas employers who sell their businesses and would discourage the protection of jobs during such transactions."

We may well agree with the district court regarding the award sans penalty constituting adequate compensation to the claimants, regarding the admirable public policy considerations in protecting employees' jobs when negotiating sale of businesses, and regarding AOS's good faith in stipulating to the amount of vacation liability, but these considerations are beyond the limited scope of judicial review of the agency action in this appeal. Neither a district court

nor an appellate court may substitute its judgment for that of the agency. *Brewer v. Schalansky*, 278 Kan. 734, 743, 102 P.3d 1145 (2004), *cert. denied* 545 U.S. 1129, 162 L. Ed. 2d 868, 125 S. Ct. 2944 (2005). The standards of review for such appeals are specifically limited by K.S.A. 77-621(c). We note that the district court failed to cite any error of law, unsupported fact finding, or other statutory basis to support its reversal of the agency conclusion and penalty assessment; absent citation and documentation of at least one of the specific statutory bases to grant relief, we must conclude that the district court has exceeded its limited scope of review.

As noted above, it is well established that "willfulness" is a question of fact. *Holder*, 224 Kan. at 411; see *Weinzirl v. The Wells Group, Inc.*, 234 Kan. 1016, 1024, 677 P.2d 1004 (1984) (Herd, J., concurring and dissenting). The agency's finding of willfulness should be upheld where facts are stated to support the finding and the agency applied the correct legal standard. See *Beckman v. Kansas Dept. of Human Resources*, 30 Kan. App. 2d 606, 612, 43 P.3d 891 (2002); *Weinzirl*, 234 Kan. at 1023. Here, the presiding officer carefully analyzed the facts applying the correct legal standard. His conclusion is not inconsistent with prior case law.

Our Supreme Court has previously reviewed the relevant legislative history of these statutory provisions and concluded that evidence supported a fact finding of willfulness where the employer's actions were unilateral, never discussed with the employee, and executed in a manner to forestall future litigation. *Holder*, 224 Kan. at 411. Similarly, where the employer applies an interpretation of its own policy that is not contained therein and is in conflict with a "proper reading" of that policy, such action has been held a willful violation. *Mid America Aerospace, Inc. v. Department of Human Resources*, 10 Kan. App. 2d 144, 148, 694 P.2d 1321, *rev. denied* 237 Kan. 887 (1985). Here, AOS not only attempted to apply an interpretation inconsistent with its policy, AOS acted unilaterally to change its vacation policy without communicating it to employees, urged its purchaser not to discuss accrued vacation liability with employees, and attempted through the asset purchase agreement to avoid litigation by assuring some vacation would be earned and payable by the successor in the first year after discharge. We

cannot conclude that the agency's findings regarding willfulness are unsupported when viewed in light of the record as a whole.

Notwithstanding evidence that AOS certainly did not intend to injure its employees with respect to their jobs, there is substantial evidence to support the conclusion that AOS intended to "cause harm" in withholding vacation pay accrued by its employees through the end of 2000. We are unable to affirm the district court, even though we respect its view of the relative equities. To the extent that imposition of a penalty here sends a negative message to other Kansas employers, we view this as a legislative or policy consideration that is simply beyond our purview when reviewing the basis for an agency decision under strict statutory standards of review.

In conclusion we affirm the presiding officer's findings and conclusions and reverse the district court's reversal of penalty. The matter is remanded to the district court for the limited purpose of remanding to the agency with directions to reinstate the agency's final action.

Affirmed in part, reversed in part, and remanded.