288 N.J. Super. 14 (1996)
671 A.2d 1051
JOSE FERNANDEZ-LOPEZ, PETITIONER-RESPONDENT,
v.
JOSE CERVINO, INC., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 5, 1996.
Decided February 22, 1996.
*15 Before Judges KING, HUMPHREYS and BILDER.
William F. Perry argued the cause for appellant (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Mr. Perry, on the brief).
Marion v. G. Hinman argued the cause for respondent (Marciano & Topazio, attorneys; Ms. Hinman, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
*16 Petitioner Jose Fernandez-Lopez filed a workers' compensation petition on January 13, 1995 claiming that injuries from a fall on May 20, 1994 occurred during the course of his employment with Jose Cervino, Inc. (Cervino). Petitioner sought and was awarded benefits under our Workers' Compensation Act. The respondent Cervino appeals, contending error in the award of benefits because petitioner was (1) an undocumented alien worker ineligible for compensation benefits and (2) an independent contractor, not an employee. We find no error and affirm.

I.
Cervino operated as a general contractor in the construction business. It was a prime contractor for the construction of new residential units and the rehabilitation of existing buildings. Cervino used the services of various tradespeople in the performance of its jobs.
Petitioner is an undocumented alien from Guatamala. He had been employed as a plasterer out of a New York plasterers' union for about ten years. He was forced to leave the union in 1994 because he could not produce a "green card" permitting him to work as a noncitizen. 8 U.S.C.A. § 1324. He did odd jobs for several months until a friend referred him to Jose Cervino, the "manager, president or whatever" of Cervino. Petitioner and Jose Cervino agreed that he would do plastering work on one of the buildings which Cervino was rehabilitating. Petitioner was to do the plastering for twelve apartment units and the hallway. The term "plastering" referred to taping the seams of the drywall and ceiling and preparing them for paint, not the traditional style of spreading plaster over wire lath. On May 20, 1994 petitioner was plastering the ceiling over a stairwell area, using a ladder and some planks supplied by Cervino as make-shift scaffolding, when he fell and was hurt.

*17 II.
The judge found that petitioner's status as an undocumented alien did not bar him from obtaining workers' compensation benefits, stating:
The only case which has been reported is an old case of the Division of Workers' Compensation, [Wickham v. Monmouth Memorial Hospital, 10 N.J. Misc. 1086, 162 A. 891 (Dept. Labor 1932)], in which the Workers' Compensation Bureau held that a non-residential alien widow could recover compensation for the death of her husband. The award was based on the philosophy that the Compensation Act is remedial and to be liberally construed....
The prevailing view in the United States is that undocumented aliens are entitled to the protection of Workers' Compensation Act[s]. It is not the illegality of the employment which would bar compensation. It is the illegality of the work itself.
The only requirement for Workers' Compensation is that there be a contract of employment and that the injury arise out of and during the course of that employment. The philosophy which denies unemployment benefits to undocumented aliens is totally different from the philosophy which guides the Workers' Compensation Act. A legal ability to work is a requirement of the unemployment law and, therefore, an undocumented alien who is legally unable to work is disqualified from those benefits.
In addition, the unemployment law is partially funded by the Federal Unemployment Tax and in order to receive the Federal Tax credit, the unemployment law of each state must comply with the Federal standards and granting unemployment to undocumented aliens would violate those standards.
Those considerations do not apply to Workers' Compensation. A comparable benefits act to Workers' Compensation is the No Fault Automobile Insurance Act, particularly since the PIP carrier is required to pay benefits arising out of a motor vehicle accident immediately and is then entitled to a reimbursement from the Workers' Compensation carrier should the accident be found to be compensable, and in the case of Montoya v. Gateway Ins. Comp., 168 N.J. Super. 100 [401 A.2d 1102] (App.Div. 1979), the court upheld the alien's rights to recover under the No Fault Automobile Insurance policy.
Cervino argues that under New Jersey law undocumented aliens should not be entitled to workers' compensation benefits. Alternatively, Cervino claims that even if undocumented aliens are generally entitled to benefits, the judge erred by refusing to consider petitioner's alien status as relevant to the decision that petitioner was an employee rather than an independent contractor.
We find no published opinions in this State discussing whether undocumented aliens are entitled to workers' compensation benefits. This question is one of first impression, perhaps because it *18 has previously been taken for granted that undocumented aliens were included under the statute, which states that the term "`employee' is synonymous with servant, and includes all natural persons ... who perform service for an employer for financial consideration ..." N.J.S.A. 34:15-36. Thus, unless undocumented aliens, like longshoremen or "casual employees," are expressly excluded, they self-evidently fall within the statutory definition.[1] This reasoning has led commentators to conclude that "in every state, but Vermont, statutes require employers to provide workers compensation protection for both documented and undocumented workers who are injured in the workplace." See, Michelle Mcaloon, Comment, Working but not "Available to Work": Reconciling the Rights of Undocumented Laborers with the Immigration Reform and Control Act of 1986, 15 Chicano-Latino L.Rev. 92, 108 (1994); Mark A. Miele, Note, Illegal Aliens and Workers' Compensation: The Aftermath of Sure-Tan and IRCA, 7 Hofstra Lab. L.J., 393, 394 n. 12 (1990).
The few published opinions from other state courts which have directly addressed this issue have uniformly held that undocumented aliens are entitled to workers' compensation. See Gene's Harvesting v. Rodriguez, 421 So.2d 701 (Fla. Dist. Ct. App. 1982) (noting that the state workers' compensation statute expressly included "aliens among those `employees' entitled to benefits, and *19 nothing in the statute suggests that workers not lawfully immigrated are excluded"); Commercial Standard Fire and Marine Co. v. Galindo, 484 S.W.2d 635, 637 (Tex.Civ.App. 1972) (holding that an employee "whose entry may be contrary to the immigration laws is not barred, by that reason alone, from receiving workmen's compensation benefits"); Testa v. Sorrento Restaurant, 10 A.D.2d 133, 197 N.Y.S.2d 560 (N.Y. App. Div. 1960) (holding that an Italian national was entitled to workmen's compensation notwithstanding the fact that he had entered the country illegally).
Cervino essentially contends that petitioner's "employment status is predicated upon an alleged contract of employment. If [petitioner] is an illegal alien, it is against Federal law for him to be in the United States and work here. Therefore, it appears that his contract of employment must be illegal." Whatever superficial appeal this logic might have, the argument is clearly contrary to the existing authorities. Under Cervino's logic, the very fact of an undocumented alien's illegal presence would render illegal any and all contracts which arise from his presence in the country. We addressed a similar argument in Montoya v. Gateway Ins. Co., 168 N.J. Super. 100, 401 A.2d 1102 (App.Div.), certif. denied, 81 N.J. 402, 408 A.2d 796 (1979), and found it unconvincing. Montoya dealt with an undocumented alien who sought to enforce the personal injury protection portions of his no-fault automobile insurance policy under which he was the named insured. Among other theories, the insurance company advanced the claim that an alien was not entitled to receive the income-continuation benefits he had contracted for because his status rendered his employment illegal and prevented him from enjoying an "occupational status," an express condition of eligibility. Judge Morgan rejected this argument, explaining:
... [W]e distinguish between work which, in and of itself, violates the law and work which, although lawful, is engaged in by a person under a disability to do it. The former situation encompasses illegal work, such as bookmaking and all other types of criminal conduct.... One doing such work is not in an occupational status.... Plaintiff, however, did not do that kind of work. His job was legal, although he was forbidden by law to do it.
[Id. at 106, 401 A.2d 1102.]
*20 In response to the insurance company's argument that the alien had no right to access to our courts and that his contract was unenforceable, Judge Morgan stated:
Although New Jersey has not had occasion to address the issue and the United States Supreme Court has made no pronouncement thereon, a well established body of law holds that illegal aliens have rights of access to the courts and are eligible to sue therein to enforce contracts and redress civil wrongs such as negligently inflicted personal injuries. [citations omitted]. These holdings are premised on the Fifth and Fourteenth Amendments to the United States Constitution, both of which use the word "person," not "citizen," to describe the beneficiaries to the described rights and receive further support from congressional recognition in 42 U.S.C.A. § 1981 in the following language:
All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings.
[Id. at 104, 401 A.2d 1102.]
Thus, Montoya supports the proposition that an undocumented alien's employment contract is valid, so long as the work he contracts to do is legal.
In Montoya, we also examined the public policy of discouraging illegal immigration and concluded that it
will not be subverted by according such aliens access to our courts. It cannot be supposed that anyone illegally enters this country for the purpose of initiating litigation. Indeed, forbidding aliens access to the courts may have precisely the reverse effect. Potential employers may well be encouraged to employ such aliens if they become aware of the alien's inability to lodge claims against them for wages or on account of injuries sustained. Insurance companies may well be encouraged to insure them in anticipation of being able to renege with impunity after a covered loss has occurred.
[Ibid.]
Similarly, the public policy against illegal immigration may actually be subverted by refusing to grant undocumented aliens workers' compensation benefits. Employers might be anxious to hire illegal aliens rather than citizens or legal residents because they will not be forced to insure against or absorb the costs of industrial accidents.
Cervino also relies on Brambila v. Board of Review, 241 N.J. Super. 216, 574 A.2d 992 (App.Div. 1990), rev'd on other *21 grounds, 124 N.J. 425, 591 A.2d 605 (1991),[2] which held that undocumented aliens were not entitled to unemployment benefits. Brambila, however, is quite different. In that case, the applicable New Jersey statute, N.J.S.A. 43:21-4(i)(1), provided:
Benefits shall not be paid on the basis of services performed by an alien unless such alien is an individual who was lawfully admitted for permanent residence at the time the services were performed and was lawfully present for the purpose of performing the services or otherwise was permanently residing in the United States under color of law at the time the services were performed ...
The New Jersey's Workers' Compensation Act currently contains no such exclusion.
Senate Bill # 212, currently pending action in that body, would exclude:
(2) employees who are aliens unless they were lawfully admitted for permanent residence at the time the employment was performed, were lawfully present for the purpose of performing the employment, or otherwise were permanently residing in the United States under color of law at the time the employment was performed (including aliens who were lawfully present in the United States as a result of the application of the provisions of section 203(a)(7) or section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. § 1153(a)(7) or 9 U.S.C. § 1128(d)(5), respectively);
Unless and until the Legislature expressly excludes undocumented aliens from workers' compensation benefits, the compassionate public policy which animates this social legislation favors inclusion of all injured workers not specifically excluded by the Legislature. 1A Larson's Worker Compensation Law § 35.20 n. 55.2 (1990 & Supp.)
Cervino alternatively argues that, even if undocumented aliens fit under the general definition of an employee, courts should still consider an individual's undocumented status when determining whether or not an employee-employer relationship exists. Cervino asserts that undocumented aliens will always be found to be "totally, economically dependent" and thus will always *22 be held employees, because the nature of their status severely curtails the avenues through which they can pursue economic gain.
Cervino is correct to an extent; it would be improper for a judge to look at the specific economic hardships caused by a petitioner's undocumented status and from those conclude that the individual was "totally, economically dependent" for eligibility purposes. An analogous situation confronted the Court of Appeals for the District of Columbia Circuit in Rivera v. United Masonry, Inc., 948 F.2d 774 (D.C. Cir.1991). There, the court found that when the lack of "suitable alternate employment" was a prerequisite to certain workers' compensation benefits, judges should consider whether someone of like age, education, work experience and physical disability could find employment. Judges should not, however, take an employee's status as an undocumented alien into account. The court reasoned that the workers' compensation act was meant to compensate those who were rendered unable to find alternate work "because of injury," not because legal employment was unavailable. Id. at 775. To hold otherwise would mean that "many partially injured undocumented aliens who can work would receive total disability benefits  benefits that would not be available to injured, legal workers in the same position ..." Id. at 776.
Courts should not find that an individual is economically dependent because of his immigration status; an undocumented alien should never be found "economically dependent" when a U.S. citizen in the same circumstances would not be. That, however, is not what happened in this case. The judge here based his finding of economic dependency on the fact that petitioner devoted his entire work effort to plastering for Cervino. The judge also considered other factors, such as who finished the plastering work after the accident. This indicated an employee-employer relationship which was completely unrelated to petitioner's immigration and alien status.
Cervino is also incorrect in his assertion that the reality of an undocumented alien's situation would be certain to lead to a finding of economic dependency. One can easily imagine an *23 undocumented alien arranging, for example, to tend on an ongoing basis to the lawns and gardens of twenty homeowners. This person would surely be an independent contractor, even though his inability to secure legal employment prevented him from entering the economic mainstream. Likewise, if petitioner had worked for two or three different contractors or had lined up future plastering jobs for others, the judge in this case might well have found that he was an independent contractor, in spite of his undocumented status. In the case before us, we reject the undocumented-alien defense in any guise.

III.
The judge determined that, under the "relative nature of the work test," petitioner and Cervino had an employee-employer relationship. The scope of our review is limited to
a determination of whether the findings of the judge of compensation could reasonably have been reached on sufficient credible evidence present in the whole record, after giving due weight to his expertise in the field and his opportunity of hearing and seeing the witnesses.
[DeAngelo v. Alsan Masons, Inc., 122 N.J. Super. 88, 299 A.2d 90 (App.Div.), aff'd o.b., 62 N.J. 581, 303 A.2d 883 (1973); See also Close v. Kordulak Bros, 44 N.J. 589, 599, 210 A.2d 753 (1965).]
When determining whether an individual should be considered an employee, the judge must consider all of the circumstances bearing on the relationship of the parties. Smith v. E.T.L. Enterprises, 155 N.J. Super. 343, 382 A.2d 939 (App.Div. 1978). The judge should not define "employee" mechanically or restrictively, Marcus v. Eastern Agricultural Ass'n, 58 N.J. Super. 584, 602, 157 A.2d 3 (App.Div. 1959), but should construe the term liberally "in order to bring as many cases as possible within the coverage of the [workers' compensation] act." Smith, supra, 155 N.J. Super. at 349, 382 A.2d 939.
Our courts apply two tests when determining whether an individual is an employee or an independent contractor  the "control test" and "the relative nature of the work test." Pollack v. Pino's Formal Wear, 253 N.J. Super. 397, 407, 601 A.2d 1190 (App.Div. *24 1992). "[B]oth tests are basically designed to draw a distinction between those occupations which are properly classified as separate enterprises and those which are in fact an integral part of the employer's regular business." Smith, supra, 155 N.J. Super. at 350, 382 A.2d 939.
In this case, the judge based his decision on the relative nature of the work test; he considered the control test unilluminating on the facts before him. Under the relative nature of the work test, an employee-employer relationship exists where the worker shows "substantial economic dependence" upon the "employer" and demonstrates a "functional integration" of their respective operations. Smith, supra, 155 N.J. Super. at 353, 382 A.2d 939 (quoting Caicco v. Toto Bros., Inc., 62 N.J. 305, 310, 301 A.2d 143 (1973)).
Here, the judge found that Cervino was in the business of rehabilitating buildings and that plastering work was an integral part of that business. This satisfied the "functional integration" prong of the relative nature of the work test. The judge also found that petitioner's "entire work effort was devoted to the performance of the work for the respondent." Petitioner worked long hours; he did not work for anyone else at any time during his employment with Cervino; he was economically dependent on Cervino.
Although the judge stated that the parties "negotiated" the price for the plastering job, the judge found that the sum was essentially set by Jose Cervino, was lower than petitioner requested and was considerably lower than the cost of unionized labor. The judge observed that petitioner believed that Jose Cervino, if happy with petitioner's work, would use him for plastering work on other buildings.
The judge found that "in the overall evaluation of the testimony, I find petitioner to be credible." The judge accepted his testimony that, following the accident, the plastering job was completed by Carlos Perez, Cervino's sole regular, salaried employee, not by *25 a contractor. This was an additional factor which indicated an employee-employer relationship because "[i]f petitioner was an independent contractor and if [Cervino] had a contract with him, it would have been [petitioner's] responsibility" to see to it that the plastering work was completed. Jose Cervino claimed that he had hired another contractor to complete the work but he could not remember his name nor how much he had paid.
Cervino unconvincingly argues that the judge's conclusion that petitioner was an employee "flies in the face of the testimony and evidence contained in the record." Cervino argues that petitioner "purported to be an independent businessman by offering his own business card." The parties agree that petitioner gave Jose Cervino a printed card at their first meeting which was inscribed "Jose and Rafael Plastermen, Professional Plaster Works." Petitioner testified that, after he lost his job through the union, he took the names of his two children, Jose and Raphael, and had the cards printed so that his children would think that he might still get plastering work. Aside from an occasional repair job for a friend, petitioner did no plastering work between the loss of his union job and the start of his job with Cervino. The judge accepted petitioner's explanation that the card "was printed up in order to give [petitioner] some degree of self respect with his children after he was terminated from the union." The judge concluded that the business card, though a factor to consider, was not very important in his employee-employer determination.
Cervino also argues that the judge did not give enough weight to the fact that petitioner "was able to negotiate his own price for the job" with Jose Cervino. While Jose Cervino testified petitioner gave him a "bid" and he paid that price, petitioner testified that Cervino set the price and he accepted it because he needed the work but that the price was less than the job was worth. As a union worker, petitioner made $23 per hour, $46 per hour for overtime. Jose Cervino agreed that the price was considerably "lower than what the same job would require with union labor."
The parties disagreed about the exact price and method of payment. Petitioner testified that he was to be paid $3,900 for the *26 total job and that, as well as he remembered, he received three weekly payments, the first for $500, the second for $800, and the third for $800 (a total of $2,100). According to petitioner, Jose Cervino paid him by check, which petitioner would endorse and give to Jose Cervino in exchange for cash.
Jose Cervino said that the total price for the job was $4,000. As Jose Cervino recalled the events, he paid petitioner about $500 to start and $1,800 a week or two later, a total of $2,300. Although Jose Cervino himself sometimes cashed the checks he issued for construction services, he believed that petitioner cashed the $1,800 check at the bank. The judge found that $4,000 was the total agreed-upon price but believed petitioner regarding other specifics and treated the low overall price for the job as evidence of economic dependence rather than free negotiation.
We find no reason to disturb the finding that petitioner was Cervino's employee. The judge found petitioner credible. In addition to the facts which the judge specifically mentioned in his decision, there was evidence at trial that Jose Cervino, (1) bought and supplied all plastering supplies and equipment, including ladders and scaffolding, with the exception of personal tools which already belonged to petitioner, trowels and stilts, (2) occasionally yelled at petitioner and reprimanded him about the work, (3) sent petitioner on errands, and (4) reviewed petitioner's work almost daily.
When petitioner was hurt, he would not permit anyone to call an ambulance because he was afraid he would get into trouble with Jose Cervino. He stayed put until Jose Cervino arrived on the scene several hours later. Moreover, there was no written contract between the parties and petitioner did not supply Cervino with an insurance certificate.
While the record may be susceptible of varying inferences, we find that there was sufficient evidence to support the judge's conclusion that an employment relationship existed.
Affirmed.
NOTES
[1] N.J.S.A. 34:15-36 states in pertinent part:

"Employer" is declared to be synonymous with master, and includes natural persons, partnerships, and corporations; "employee" is synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration, exclusive of (1) employees eligible under the federal "Longshore and Harbor Workers' Compensation Act," 44 Stat. 1424, (33 U.S.C. § 901 et seq.), for benefits payable with respect to accidental death or injury, or occupational disease or infection; and (2) casual employments, which shall be defined, if in connection with the employer's business, as employment the occasion for which arises by chance or is purely accidental; or if not in connection with any business of the employer, as employment not regular, periodic or recurring; provided, however, that forest fire wardens and forest firefighters employed by the State of New Jersey shall, in no event, be deemed casual employees.
[2] The Supreme Court reversed on the issue of whether aliens who were eligible for work authorization but unable to document that eligibility were "lawfully present" under the statute. In this case, the record does not disclose whether petitioner was eligible for work authorization or not.