No. 95,537

Coma Corporation d/b/a Burrito Express, and Mario Coria, Individually, *Appellees*, v. Kansas Department of Labor, *Appellant*, and Cesar Martinez Corral.

(154 P.3d 1080)

Opinion filed March 23, 2007.

*Darren E. Root*, of the Kansas Department of Labor, argued the cause, and *A.J. Kotich*, of the same department, was with him on the brief for appellant.

*Diane F. Barger*, of Wichita, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

NUSS, J.: Cesar Martinez Corral filed a claim for his earned but unpaid wages against his employer, Coma Corporation, d/b/a Burrito Express, and its president, Mario Coria. The Kansas Department of Labor (KDOL) determined that both respondents (Coma) owed Corral wages plus interest and also assessed a civil penalty for a total of $7,657 under the Kansas Wage Payment Act, K.S.A. 44-312 *et seq.*

On Coma's petition for review pursuant to the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*, the district court reversed in part. It concluded that because Corral was an undocumented worker not legally permitted to work in the United States he was only entitled to the applicable minimum wage for work performed and was not entitled to a penalty. The KDOL appeals directly to this court under the KJRA.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Is an undocumented worker's employment contract enforceable under the Kansas Wage Payment Act? Yes.
2. Did the Kansas Department of Labor err in assessing penalties against Coma pursuant to K.S.A. 44-315(b)? No.

Accordingly, we affirm in part and reverse in part the judgment of the district court. We affirm the judgment of KDOL.

## FACTS

Mario Coria is the president of Coma Corporation, a Wichita enterprise. On May 17, 2004, after Cesar Martinez Corral was fired from his Coma employment, he filed a claim for earned but unpaid wages. Corral alleged that he worked as a cook for Coma from October 2003 to May 12, 2004, at a pay rate of $6 per hour.

Corral testified at a telephone wage hearing conducted by a KDOL hearing officer. Corral stated that the manager, Luis Calderon, agreed to pay him $6 per hour with weekly payment. Although Corral maintained that he worked 6 or 7 days per week (50

to 60 hours), he only requested wages for 24 weeks at 40 hours per week—for a total of $5,760. He further testified that he was paid "$50 or $60 bucks a week." Based upon payment received of $60 per week, the hearing officer clarified that Corral was requesting $5,760 (24 weeks times 40 hours at $6 an hour) minus $2,040 ($1,440 [$60 actually paid per week times 24 weeks] minus $600 [rent of $100 per month times 6 months]) for a total of $3,760. No one besides Corral testified.

In granting Corral's claim, the hearing officer determined that the evidence presented no issues of fact and awarded wages plus interest:

"The evidence as to the agreement, the work done and the payment of some wages is not conflicting and presents no issue of fact to be resolved by the Presiding Officer. . . .

"The Claimant's evidence meets the burden of proof and establishes the contract, the services and the unpaid wages. Respondent failed to rebut Claimant's evidence. The *Kansas Wage Payment Law* requires Respondent to pay wages to Claimant in the amount of $3,720. Interest is assessed at 10% per annum for a total of $217."

The hearing officer also awarded Corral a penalty of $3,720 for Coma's willful and knowing withholding of his wages. Based upon $3,720 in wages, $217 in interest, and a penalty of $3,720, the hearing officer awarded Corral a total of $7,657 against Coma and Coria as its president. Coma filed a motion to dismiss, or in the alternative, to set aside initial order, which the Secretary of the KDOL denied. Coma also filed a petition for review that was denied.

Coma then filed a Petition for Judicial Review of Final Order with the district court. There, KDOL stipulated that Corral is an undocumented worker "not legally permitted to work in the United States."

In a 17-page opinion, the district court concluded that the Kansas Wage Payment Act (KWPA), K.S.A. 44-312 *et seq.*, did apply to undocumented workers. It held, however, that Corral was only entitled to the applicable minimum wage for work performed because the employment contract was illegal due to Corral's status as an undocumented worker. The court remanded to KDOL for re-

calculation at the applicable minimum wage. It also reversed the hearing officer's penalty award, holding that federal immigration policy should prohibit a statutory penalty.

## ANALYSIS

*Standard of Review*

KDOL actions are reviewable under the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* See K.S.A. 44-322a (c). Our standard of review is statutorily defined by the KJRA. See *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger,* 276 Kan. 232, 245, 75 P.3d 226 (2003). KDOL argues that in the instant case a court shall grant relief to Coma *only* if it determines:

1. The KDOL has erroneously interpreted or applied the law; or

2. The KDOL action is based on a determination of fact, made or implied by the agency, that is not supported by the evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act. See K.S.A. 77-621(c)(4) and (7).

On appeal, we exercise the same statutorily limited review of the KDOL's action as does the district court, *i.e.,* " 'as though the appeal had been made directly to this court.' " 276 Kan. at 245. The party asserting the agency's action is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1). 276 Kan. at 245. As a result, Coma—as the petitioner for review to the district court— retains the burden in this court of proving that at least one of the above-listed statutory bases for error exists.

Issue 1: *An undocumented worker's employment contract is enforceable under the Kansas Wage Payment Act.*

Coma argues that Corral's employment contract was illegal and unenforceable because he is an illegal alien. Intertwined with this argument is another: Coma claims that federal immigration law preempts the KWPA. The KDOL responds that the district court was correct in concluding that Corral was covered by the KWPA, essentially rejecting the preemption argument. It argues the court

erred, however, in concluding that Corral's employment contract was illegal and unenforceable due to his status as an undocumented worker and that Corral therefore was entitled only to minimum wage.

To the extent resolution of the issues necessitates statutory interpretation, this court's review is unlimited. *Schmidtlien Electric, Inc. v. Greathouse*, 278 Kan. 810, 819, 104 P.3d 378 (2005).

As we stated in *Blue Cross & Blue Shield of Kansas, Inc., v. Praeger*, 276 Kan. at 247:

> " 'Interpretation of a statute is a question of law. [Citation omitted.] Special rules apply, however, when considering whether an administrative agency "erroneously interpreted or applied the law":
>
> "The interpretation of a statute by an administrative agency charged with the responsibility of enforcing that statute is entitled to judicial deference. This deference is sometimes called the doctrine of operative construction. . . . [I]f there is a rational basis for the agency's interpretation, it should be upheld on judicial review. . . . [However,] [t]he determination of an administrative body as to questions of law is not conclusive and, while persuasive, is not binding on the courts." [Citation omitted.]
>
> Deference to an agency's interpretation is especially appropriate when "the agency is one of special competence and experience." [Citation omitted.] However, the final construction of a statute always rests with the courts. [Citations omitted.]' "

KDOL specifically alleges that it is an agency of special competence and experience. As a result, it argues that the doctrine of operative construction applies to its interpretation providing KWPA coverage to undocumented workers such as Corral. *Cf. A.O. Smith Corp. v. Kansas Dept. of Human Resources*, 36 Kan. App. 2d 530, 535, 144 P.3d 760 (2005) (applying operative construction).

*Application of the KWPA to undocumented workers*

As mentioned, Coma's "illegal contract" argument is intertwined with its allegation that the KWPA does not apply to Corral because "it contravenes the central policy of federal immigration law," *i.e.*, state law is preempted by federal law. Coma quotes *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 55 L. Ed. 2d 179, 98 S. Ct. 988 (1978):

"[A] state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found 'where compliance with both federal and state regulations is a physical impossibility . . . ,' [citation omitted] or where the state 'law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress.' [Citations omitted.]"

Preemption is a question of law over which we exercise de novo review. *Doty v. Frontier Communications, Inc.,* 272 Kan. 880, 888, 36 P.3d 250 (2001).

Because of Coma's reliance upon preemption, it does not dispute that K.S.A. 44-313(b) of the KWPA expansively defines an employee as *"any person* allowed or permitted to work by an employer." (Emphasis added.) Nor does it dispute that pursuant to K.S.A. 44-314(a), an employer is required to pay *all* wages due to an employee at least once a month. In short, the plain language of the statute does not exclude undocumented workers from the "employee" definition or from the protections of the KWPA. Nor are there any KWPA exceptions to this expansive definition.

Coma's purported trumping argument is instead based upon 8 U.S.C. § 1324a(a) (2000), which makes employment of unauthorized aliens illegal, and *Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 152 L. Ed. 2d 271, 122 S. Ct. 1275 (2002). In *Hoffman,* the United States Supreme Court reversed a National Labor Relations Board's (NLRB) award of back pay to an undocumented worker because recovery was "foreclosed by federal immigration policy" as stated in the Immigration Reform and Control Act of 1986 (IRCA). 535 U.S. at 140. Technically, *Hoffman* itself did not involve preemption, but rather concerned a conflict between competing federal laws: the National Labor Relations Act (NLRA) and IRCA.

There, Hoffman hired Jose Castro based upon documents which purported to verify his authorization to work in the United States. Hoffman subsequently fired Castro for his involvement in a union-organizing campaign. Three years later, the NLRB concluded that Hoffman unlawfully selected four employees, including Castro, for layoff, due to involvement in union activities. As a remedy, the NLRB ordered Hoffman to, among other things, offer reinstatement and back pay to the fired employees. Later, at a compliance

meeting before an Administrative Law Judge (ALJ), Castro confirmed he had fraudulently obtained documents to support his employment application. He testified that he was born in Mexico, that he had never been authorized to work in the United States, and that he used a friend's birth certificate to fraudulently obtain a California driver's license and Social Security card. Based upon Castro's acknowledgment, the ALJ determined that the NLRB was precluded from awarding Castro back pay or offering reinstatement, because such relief was in conflict with the IRCA. Four years later, the NLRB reversed the specific issue of back pay.

In the Supreme Court's analysis, it first discussed *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 81 L. Ed. 2d 732, 104 S. Ct. 2803 (1984). In *Sure-Tan*, the Court affirmed the NLRB's determination that the NLRA applied to undocumented workers. 467 U.S. at 892. The *Sure-Tan* Court noted that "[f]or whatever reason, Congress has not adopted provisions in the INA [Immigration and Nationality Act] making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization." *Sure-Tan*, 467 U.S. at 892-93; *Hoffman*, 535 U.S. at 144-45. The *Sure-Tan* Court determined that although the NLRA applied to undocumented workers, *remedies* for violations were limited by federal immigration policy. 467 U.S. at 903.

After construing *Sure-Tan*, the *Hoffman* Court discussed changes that occurred after the case was decided:

"[T]wo years after *Sure-Tan*, Congress enacted IRCA, a comprehensive scheme prohibiting the employment of illegal aliens in the United States. . . . As we have previously noted, IRCA 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.' [Citation omitted.] It did so by establishing an extensive 'employment verification system,' § 1324a(a)(1), designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States, § 1324a(h)(3). This verification system is critical to the IRCA regime. To enforce it, IRCA mandates that employers verify the identity and eligibility of all new hires by examining specified documents before they begin work. § 1324a(b). If an alien applicant is unable to present the required documentation, the authorized alien cannot be hired. § 1324a(a)(1)." 535 U.S. at 147-48.

Based on the foregoing analysis, the *Hoffman* Court reasoned that as an undocumented worker, Castro did not have the right to

a remedy based on the presumption of his *continued* illegal employment. 535 U.S. at 149. Thus, wages for work not actually performed were not appropriate.

The Court concluded:

"[A]llowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations. However broad the Board's discretion to fashion remedies when dealing only with the NLRA, it is not so unbounded as to authorize this sort of an award." 535 U.S. at 151-52.

To begin our preemption analysis, we acknowledge that the Supremacy Clause of Article VI of the United States Constitution provides for federal preemption of state law. Preemption may arise through an express provision, by implication, or through conflict between a federal and state law. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 131 L. Ed. 2d 695, 115 S. Ct. 1671 (1995). Through Coma's citation to *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, it argues "conflict preemption." See *Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 356, 812 N.Y.S.2d 416, 845 N.E.2d 1246 (2006) (citing *Ray*).

Preemption, however is not presumed: "[D]espite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law. [Citation omitted.]" 514 U.S. at 654-55; see also *Doty v. Frontier Communications, Inc.*, 272 Kan. 880, Syl. ¶ 5, 36 P.3d 250 (2001) ("In the absence of express preemption in a federal law, there is a strong presumption that Congress did not intend to displace state law."). Additionally, " 'it is well established that the states enjoy 'broad authority under their police powers to regulate . . . employment relationship[s] to protect workers within the state.' " *Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 228 (2d Cir. 2006) (citing *DeCanas v. Bica*, 424 U.S. 351, 356, 47 L. Ed. 2d 43, 96 S. Ct. 933 [1976]). "[M]inimum and other wage

laws . . . and workmen's compensation law are only a few examples" of the exercise of this broad authority. 424 U.S. at 356.

In *Madeira*, the Second Circuit Court of Appeals thoroughly examined preemption issues arising after *Hoffman*. There, an undocumented worker who was injured while working at a construction site sued his employer for failing to provide adequate safety equipment in violation of New York state law. On appeal, the employer and others argued that pursuant to *Hoffman*, "federal immigration law prohibiting the employment of undocumented aliens precludes state tort or labor law from awarding an injured undocumented worker . . . compensatory damages for lost earnings at United States pay rates." 469 F.3d at 227. The *Madeira* court specifically noted that unlike the worker in *Hoffman* who had fraudulently obtained and provided false documents to his employer, which is criminal conduct under IRCA, Madeira had not done so. It held that outside of knowingly or recklessly using false documents to obtain employment, Congress did not otherwise prohibit undocumented aliens from seeking or maintaining employment. 469 F.3d at 231.

After extensively discussing principles of federal preemption, the Second Circuit limited *Hoffman's* holding and concluded that the applicable state law was not an obstacle to IRCA's policy objectives under any type of preemption theory:

"In short, federal immigration law did not excuse the *Hoffman Plastic* employer from its general NLRA duties *to engage in fair workplace practices toward all workers; it only precluded the NLRB from employing a particular remedy—backpay—when the victim of the unfair labor practice was an undocumented alien who had secured his employment through fraud and whose termination was, in fact, effectively required by IRCA.* . . . Instead, as in *Hoffman Plastic*, the policy conflict issue in this case reduces to a concern about remedies, specifically, New York state's ability to award workers, including undocumented aliens, some measure of lost United States earnings in compensation for disabling injuries caused by workplace negligence." (Emphasis added.) 469 F.3d at 242.

Similarly, in *Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, after extensive discussion of preemption, New York's highest court held that *Hoffman* did not preempt state law and did not prevent awarding injured undocumented workers compensatory damages for lost

earnings. As did the *Madeira* court, it noted that unlike in *Hoffman*, its undocumented workers had not themselves violated federal immigration law when they procured employment. 6 N.Y.3d at 360-61. With this holding, *Balbuena* resolved a split that had developed between the New York state appellate divisions. See *Madeira*, 469 F.3d at 227 fn.8.

*Madeira's* and *Balbuena's* conclusions on preemption are consistent with other jurisdictions. As the district court in the instant case generally noted,

"[m]ost state courts examining this issue in the context of a state's particular labor law have ruled in favor of protecting the rights of aliens. *See, e.g. Gomez v. Falco*, 6 Misc. 3d 5 (N.Y. App. Term 2004) (state wage payments act applicable to illegal aliens); *Design Kitchen and Baths v. Lagos*, 2005 WL 2179187 (Md. Sept. 12, 2005) (undocumented worker 'covered employee' under worker's compensation statute); *Continental Pet Technologies, Inc. v. Palacias*, 269 Ga. App. 561, 562, 604 S.E.2d 627, 629 (2004) (IRCA does not preempt state workers' compensation act); *Cherokee Industries, Inc. v. Alvarez*, 84 P.3d 798, 799 (Okla. Civ. App. 2003) (workers' compensation act does not exclude alien workers); *Safeharbor Employer Svcs., Inc. v. Cinto Velazquez*, 860 So.2d 984, 985 (Fla. 2003) (worker's status as illegal alien does not preclude receipt of workers compensation benefits); *Dowling v. Slotnik*, 244 Conn. 781, 797, 712 A.2d 396, 405 (1998) (workers' compensation act protects illegal aliens)."

The district court, however, also acknowledged contrary case law limiting rights of undocumented workers, citing *Crespo v. Evergo Corp.*, 366 N.J. Super. 391, 399-400, 841 A.2d 471 (2004) (worker's undocumented status precluded termination benefits); *Bastas v. Board of Review, Dept. of Labor and Ind.*, 155 N.J. Super. 312, 315, 382 A.2d 923 (1978) (illegal alien may not receive unemployment benefits); *Granados v. Windson Development Corp.*, 257 Va. 103, 108-09 (1999) (illegal alien not an "employee" under workers compensation act), *superceded by statute as stated in Rajeh v. Steel City Corp.*, 157 Ohio App. 3d 722, 732, 813 N.E.2d 697 (1999); and *Sanango v. 200 East 16th St. Housing Corp.*, 788 N.Y.S.2d 314, 321, 15 A.D.3d 36 (2004) (undocumented worker may not be awarded lost earnings for a personal injury action based on wages he would have earned; later overruled by *Balbuena*).

Although not involving an issue of federal preemption of state law, but rather one of potential conflict between two federal laws—

IRCA and the Fair Labor Standards Act (FLSA)—the district court also noted that federal courts have consistently upheld the applicability of FLSA protections to undocumented employees. See *Patel v. Quality Inn South*, 846 F.2d 700, 705-06 (11th Cir. 1988) (under the FLSA, undocumented worker was entitled to recover unpaid minimum wages and overtime for work already performed); *Donovan v. Burgett Greenhouses*, 759 F.2d 1483, 1486 (10th Cir. 1985) (employer required to pay wages, including overtime for work performed by illegal aliens); *Chellen v. John Pickle Co.*, 344 F. Supp. 2d 1278, 1294 (N.D. Okla. 2004) (Indian nationals not authorized to work in the United States were "employees" under the FLSA); and *Flores v. Amigon*, 233 F. Supp. 2d 462, 463 (E.D. N.Y. 2002) (*Hoffman* is not extended when "the plaintiffs had already performed the work for which unpaid wages were being sought.").

The district court also observed that there is little precedent in Kansas upon which to rely. It stated that this court

"without squarely addressing the issue, has allowed an illegal alien to make a claim for worker's compensation benefits, *Acosta v. National Beef Packing Co.*, 273 Kan. 385, 44 P.3d 330 (2002), but punished the same employee for using fraudulent documents and lying in order to obtain such workers compensation benefits. *In re Doe*, 277 Kan. 795, 803-04, 807, 90 P.3d 940 (2004)."

Based upon the weight of what the district court considered "persuasive authority," and the plain language of K.S.A. 44-313(b), the court concluded that like the FLSA, the KWPA applies to undocumented workers. It specifically noted "the reasoning of many courts which have addressed this question—that the enforcement of employment statutes actually furthers the goals of the IRCA by creating disincentives for employers to hire illegal aliens," and that K.S.A. 44-313(b) "on its face makes no exception for illegal aliens."

We agree. Based upon other jurisdictions' rejection of IRCA preemption of certain state labor laws, coupled with their narrow reading of *Hoffman*, we conclude that under this case's facts, Coma has not overridden the presumption against federal preemption afforded by the Supremacy Clause.

More specifically, we agree that the KWPA applies to earned, but unpaid, wages of an undocumented worker—the exact ques-

tion before us. See *e.g.*, *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295 (N.J. 2005); *Flores*, 233 F. Supp. 2d 462; *Zeng Liu v. Donna Karan Intern., Inc.*, 207 F. Supp. 2d 191, 192 (S.D. N.Y. 2002) ("Courts have distinguished between awards of post-termination back pay for work not actually performed and awards of unpaid wages pursuant to the Fair Labor Standards Act"); *Singh v. Jutla*, 214 F. Supp. 2d 1056, 1060-61 (N.D. Cal. 2002) (*Hoffman* does not hold that an undocumented employee is barred from recovering unpaid wages for work actually performed); *Garcia v. Pasquareto*, 11 Misc. 3d 1, 812 N.Y.S.2d 216 (2004) (courts construing *Hoffman* have consistently held that it has no effect on claims for wages earned but not paid); *Gomez v. Falco*, 6 Misc. 3d 5, 792 N.Y.S.2d 769 (2004) (award for payment due and owing not back pay barred by federal immigration law); *Galaviz-Zamora v. Brady Farms, Inc.*, 230 F.R.D. 499, 501-03 (W.D. Mich. 2005); *Hernandez-Cortez v. Hernandez*, 2003 WL 22519678, at *6 (D. Kan. 2003) (unpublished opinion) (plaintiff correct in arguing that *Hoffman* does not prevent undocumented employees from recovering unpaid wages for work actually performed); and *Flores v. Albertsons, Inc.*, 2002 WL 1163623, at *5 (C.D. Cal. 2002) (unpublished opinion) ("*Hoffman* does not establish that an award of unpaid wages to undocumented workers for work actually performed runs counter to IRCA").

Coma's cited cases, *Chaudhry v. Mobil Oil Corp.*, 186 F.3d 502 (4th Cir. 1999) (foreign national was not qualified for employment because failed to present documentation and was thus not protected by Title VII or ADEA), and *Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184 (4th Cir. 1998) (former employee had no cause of action under Title VII because of his status as alien without work authorization), do not address the earned but unpaid wages of an undocumented worker. Because they are easily distinguishable, they are unpersuasive.

Finally, we agree with the rationale set forth in *Flores v. Amigon*, 233 F. Supp. 2d 462, where the court granted FLSA protections to an undocumented worker and determined that payment of unpaid wages for work actually performed furthers the federal immigration policy:

"Indeed, it is arguable that enforcing the FLSA's provisions requiring employers to pay proper wages to undocumented aliens when the work had been performed actually furthers the goal of the IRCA, which requires the employer to discharge any worker upon discovery of the worker's undocumented alien status. 8 U.S.C. § 1324a(a)(2). If employers know that they will not only be subject to civil penalties, 8 U.S.C. § 1324a(e)(4)(A), and criminal prosecution, 8 U.S.C. § 1324a(f)(1), when they hire illegal aliens, but they will also be required to pay them at the same rates as legal workers for work actually performed, there are virtually no incentives left for an employer to hire an undocumented alien in the first instance. [Citation omitted.] Whatever benefit an employer might have gained by paying less than the minimum wage is eliminated and the employer's incentive would be to investigate and obtain proper documentation from each of his workers." 233 F. Supp. 2d at 464.

### The legality of the employment contract

In an argument heavily intertwined with federal preemption, Coma also asserts that Corral's employment contract is illegal under state law. Specifically, it argues that KDOL regulations require that a contract of employment contain lawful provisions in order to be enforceable. Coma reasons that because Corral does not have a legal right to be or to work in the United States, his contract violates IRCA and is unenforceable under KDOL regulations and state law. In support, it cites *Sweet v. Stormont Vail Regional Medical Center*, 231 Kan. 604, 611, 647 P.2d 1274 (1982) (contracts that are unreasonable or illegal are unenforceable).

The district court appeared to agree with Coma. Despite acknowledging that Corral was an employee under the KWPA, it stated:

"[T]he Court's analysis does not end here. The KWPA, unlike many of the employment statutes at issue in the above cited cases, is heavily dependent on the contract between the employer and the employee. Accordingly, a closer examination of Mr. Corral's claim is required."

The court then referenced K.A.R. 49-20-1 *et seq.*, which provides procedures for enforcing the payment of wages. K.A.R. 49-21-2(b)(6) states in part:

"When the evidence shows there is probable cause to believe that a violation has occurred, the investigator shall attempt to obtain payment or settlement through conciliation of the parties to the dispute.

"Determination of an alleged violation shall be based upon:

"(A) The *lawful* provisions of the employment agreement or contract between the employer and employee." (Emphasis added.)

After noting that the regulation requires a lawful contract, the district court concluded that Corral's contract was not lawful:

"Since Mr. Corral is an illegal alien, without a legal right to work in the United States, under both the IRCA and *Hoffman*, the oral employment agreement between him and the Petitioners undeniably violates the 'central policy of immigration law.' *Hoffman*, 535 U.S. at 147. Given this, one can hardly argue the contract was a legal one, enforceable under Kansas law.

. . . .

"This court holds as a matter of law that the oral employment contract between Mr. Corral and the Petitioners, for amounts above the minimum wage, *is contrary to the IRCA, and is therefore illegal under Kansas law and unenforceable under the KWPA.* See *Petty v. City of El Dorado,* 270 Kan. 847, 854, 19 P.3d 167, 172 (2001) (court may void those contract provisions which violate the law)." (Emphasis added.)

Given our rejection of IRCA preemption of the KWPA on Corral's claim for earned yet unpaid wages, we initially are unclear how his employment contract can violate IRCA and therefore be illegal and unenforceable. The case of *Neville, Administratrix v. Wichita Eagle,* 179 Kan. 197, 294 P.2d 248 (1956), illustrates our concern. There, the mother of a deceased 16-year-old employee argued that federal law—the FLSA—required that he be 18 years old in order to have performed the hazardous job of operating an elevator. She essentially argued that although he was legally employed under Kansas law—minimum age 16—he was "unlawfully employed," *i.e.*, his contract was illegal, pursuant to the FLSA greater age requirement. 179 Kan. at 201. She argued that as a result, Kansas workers compensation law did not cover her son and its "exclusive remedy" provision did not bar her wrongful death action.

In essentially refusing to find that the federal law preempted Kansas law and made his employment contract illegal, this court held that the son was covered by workers compensation:

"We cannot agree with the appellant's contention. In filing her action to recover for wrongful death appellant sought relief afforded by the statutes of this state and her rights are measured by our statutes. . . . We hold that the test of the minor's capacity to enter into an employment contract is that fixed by the laws of

this state; that the employment was a lawful one under our workmen's compensation act, and that the liabilities of the employer for injury resulting in the workman's death are measured by that act." 179 Kan. at 203.

Under our district court's rationale, the *Neville* court correctly held there was no preemption by the FLSA, but then *should* have held that the FLSA applied to make the employment contract illegal.

Even assuming that our rejection of federal preemption on Corral's wage claim does not foreclose Coma's argument that his employment contract violates IRCA, we disagree that IRCA makes the contract illegal and therefore unenforceable. Kansas has not examined this exact issue. Despite the district court's conclusion that many of the employment statutes at issue in other states are unlike the KWPA, other jurisdictions do provide guidance on the issue of purported illegal contracts with undocumented workers.

Prior to IRCA's enactment, the Alaska Supreme Court confronted the issue of whether a contract of employment entered into by a Canadian alien was barred by illegality. *Gates v. Rivers Construction Co., Inc.*, 515 P.2d 1020 (Alaska 1973). The court first discussed the nature of illegal contracts:

"Generally, a party to an illegal contract cannot recover damages for its breach. But as in the case of many such simplifications, the exceptions and qualifications to the general rule are numerous and complex. Thus, when a statute imposes sanctions but does not specifically declare a contract to be invalid, it is necessary to ascertain whether the legislature intended to make unenforceable contracts entered into in violation of the statute." 515 P.2d at 1021.

The *Gates* court then concluded that enforcement of the employment contract with the Canadian alien was not barred. It looked at the statutory language:

"[I]t is clear that the contract involved here should be enforced. First, it is apparent that *the statute itself does not specifically declare the labor or service contracts of aliens seeking to enter the United States for the purpose of performing such labor or services to be void.* The statute only specifies that aliens who enter this country for such purpose, without having received the necessary certification, 'shall be ineligible to receive visas and shall be excluded from admission into the United States.' " (Emphasis added.) 515 P.2d at 1021-22.

The court next advanced the concept of equity and fairness to the employee:

"Second, that the appellee [employer], who knowingly participated in an illegal transaction, should be permitted to profit thereby at the expense of the appellant [employee] is a harsh and undesirable consequence of the doctrine that illegal contracts are not to be enforced. *This result, so contrary to general considerations of equity and fairness, should be countenanced only when clearly demonstrated to have been intended by the legislature.*" (Emphasis added.) 515 P.2d at 1022.

Finally, in a general foreshadowing of the benefit described in *Flores, i.e.,* of reducing employer incentives to violate the law, the *Gates* court stated:

"Third, since the purpose of this section would appear to be the safeguarding of American labor from unwanted competition, the appellant's contract should be enforced, because such an objective would not be furthered by permitting employers knowingly to employ excludable aliens and then, with impunity, to refuse to pay them for their services. *Indeed, to so hold could well have the opposite effect from the one intended, by encouraging employers to enter into the very type of contracts sought to be prevented.*" (Emphasis added.) 515 P.2d at 1022.

The IRCA and purported illegal employment contracts were specifically at issue in *Majlinger v. Cassino Contracting Corp.*, 25 A.D.3d 14, 802 N.Y.S.2d 56 (2005). There, an injured undocumented worker sued the contractor and site manager for injuries sustained when the worker fell from a scaffold while installing siding. In addressing whether the award of damages for lost wages was preempted by IRCA, the court held that the defendants could not avoid liability merely because of the worker's undocumented status. Within this context, the court also discussed changes to immigration law:

"[A] federal statute enacted in 1885 . . . which provided that any contract of employment with an undocumented alien was void, was repealed in 1952 with the passage of the INA [Immigration and Nationality Act] . . . . The INA, with certain exceptions, makes undocumented aliens who seek to enter his country for the purpose of performing labor ineligible to receive visas or to be admitted into the United States . . . . *This alteration of the federal statute indicates that 'Congress determined that the exclusion of certain aliens from admission to the United States was a more satisfactory sanction than rendering their contracts void and thus unjustifiably enriching employers of such alien laborers.' (Gates. v. Rivers Constr. Co.,* 515 P.2d 1020, 1023 [Alaska 1973].) [Citations omitted.] While the IRCA subsequently added provisions prohibiting the hiring of undocumented

aliens, the IRCA and the regulations that accompany it 'do not purport to intrude into the area of what protections a State may afford these aliens.' [Citations omitted.] In the absence of an *explicit statement of Congress's intent* to deprive undocumented aliens of remedies to which they would otherwise be entitled in state courts, such a disability may not be inferred." (Emphasis added.) 25 A.D.3d at 21-22.

*Majlinger* also addressed the specific contract illegality issue: "As between the undocumented worker and the employer . . . there is a contract of employment, under which the worker is entitled to be paid for his or her work." 25 A.D.3d at 24. It found unpersuasive the case law barring recovery of damages for lost income gained from illegal activities, observing that "[a]n undocumented alien performing construction work is not an outlaw engaged in illegal activity, such as bookmaking or burglary [citations omitted]. Rather, the work itself is lawful and legitimate; it simply happens to be work for which the alien is ineligible or disqualified [citations omitted]." 25 A.D.3d at 29. The court held the undocumented worker was entitled to proceed with a loss of wages claim.

*Majlinger* was affirmed by New York's highest court in the previously cited case of *Balbuena,* 6 N.Y.3d 338. There, the Court of Appeals noted that similar to the Immigration and Nationality Act (INA), the IRCA does not penalize an alien for attaining employment without having proper work authorization unless he or she engages in fraud, such as presenting false documentation to secure the employment: "Notably, IRCA does not make it a crime to work without documentation." 6 N.Y.3d at 360. Because there was no allegation that Majlinger and others had produced false work documents, the court concluded they had not committed a criminal act under IRCA. After recognizing that their presence in this country without authorization was impermissible under federal law, it nevertheless stated: "Standing alone, however, this transgression is insufficient to justify denying plaintiffs a portion of the damages to which they are otherwise entitled." 6 N.Y.3d at 361.

While the *Balbuena* court noted, as had the court in *Majlinger,* that under its case law recoveries had been denied to parties who have engaged in illegal activities, it clarified that

"in those cases it was the work being performed that was outlawed [citations omitted], whereas here, the construction work itself was entirely lawful. Moreover, neither IRCA nor any other federal or state statute makes it a crime to be an employed but undocumented alien, unless the alien secured employment through the use of false work authorization documentation." 6 N.Y.3d at 361.

Finally, on the specific issue of whether a worker was barred from bringing a state law claim for earned but unpaid wages against his employer because his contract was illegal due to his undocumented status, the court held in *Garcia v. Pasquareto*, 11 Misc. 3d 1, 3:

"To condone dismissal of actions for wages earned but not paid, regardless of the legal theory employed, on the ground that such labor contracts are 'illegal,' would thus directly contravene the public policy of the State of New York and of the United States government."

Employers' argument that a worker's undocumented status makes his employment contract illegal under IRCA and therefore void and enforceable has been rejected in the related area of workers compensation as well. In *Design Kitchen v. Lagos*, 388 Md. 718, 882 A.2d 817 (2005), the court concluded that because the IRCA does not specifically prohibit undocumented workers from seeking employment, and the definition of "employee" under state law does not exclude employees who are undocumented workers, the employment contract is not illegal. 388 Md. at 739-40; see also *Dowling v. Slotnik*, 244 Con. 781, 807, 712 A.2d 396 (1998) (because IRCA does not declare it unlawful for an undocumented worker to seek employment and then accept offer of employment, rejected argument that "an employment agreement between an employer and an illegal alien is so tainted by illegality that, as a matter of law, the agreement cannot constitute 'a contract of service' "); *Fernandez-Lopez v. Jose Cervino, Inc.*, 288 N.J. Super. 14, 18, 671 A.2d 1051 (1996) (rejecting argument that petitioner was an illegal alien, that it is against federal law for him to be in and work in this country, and that his contract of employment therefore must be illegal); *cf. Champion Auto Body v. ICAD*, 950 P.2d 671, 673 (Colo. App. 1997) ("Since IRCA did not prohibit the claimant from entering into an employment contract, we disagree with em-

ployer's argument that the claimant was under a 'legal disability' which prevented him from working.").

Although Kansas appellate courts have not examined this exact issue in the area of wages, our workers compensation case law does provide some guidance. Just as the district court in the instant case looked to Corral's employment contract for determining wages, this court has held that in the workers compensation area, "[t]he liability of an employer to an injured employee arises out of contract between them, and the terms of a statute are embodied in that contract." *Lyon v. Wilson,* 201 Kan. 768, 774, 443 P.2d 314 (1968) (cited in *Jurado v. Popejoy Constr. Co.,* 253 Kan. 116, 122, 853 P.2d 669 [1993]). And Kansas has allowed undocumented workers, *i.e.,* those with purported illegal contracts of employment, to receive workers compensation benefits under those contracts. See *In re Doe,* 277 Kan. 795, 803-04, 807, 90 P.3d 940 (2004).

Whether IRCA made the undocumented worker's employment contract illegal was not directly raised in *Doe.* Indeed, there was never an argument that the worker was not entitled to workers compensation because of her illegal alien status. Remarks at all levels of review throughout the opinion cast doubt on whether this was a valid argument. For example, the order of the Board stated: " '[I]f claimant could not legally work in the United States, that factor alone would not prevent her from recovering workers compensation benefits.' " 277 Kan. at 805. Upon the district court's review, it held: " 'The simple truth of the matter is that Petitioner lied about her identity on numerous occasions in order to obtain workers compensation benefits. *Her entitlement to those benefits is no excuse* for intentionally misrepresenting herself.' " (Emphasis added.) 277 Kan. at 800. Additionally, this court began its opinion by stating:

"This case presents the question whether a [undocumented] workers compensation claimant's use of a false name in applying for benefits and lying under oath as to her identity in the proceeding to obtain benefits were fraudulent or abusive acts under K.S.A. 44-5,120 (1993 Furse) [workers compensation act] *even though the claimant was legally entitled to the benefits she received.*" (Emphasis added.) 277 Kan. at 796.

Finally, Doe claimed that her testifying falsely or concealing or misrepresenting a material fact was prohibited under the Workers

Compensation Act only if she was trying to obtain benefits to which she was not entitled under the Act. 277 Kan. at 801. Inherent in this argument is the general contention that she was legally entitled to the benefits. In rejecting her argument, this court held that "making false statements by lying under oath in workers compensation proceedings are abusive, *notwithstanding* [her] . . . *legal entitlement to the benefits obtained.*" (Emphasis added.) 277 Kan. at 802. Indeed, the *Doe* court observed that in *Acosta v. National Beef Packing Co.*, 273 Kan. 385, 44 P.3d 330 (2002), this same claimant had received $57,936.72 in compensation and further observed that this was still a valid award. 277 Kan. at 806.

We need not decide today whether undocumented workers are entitled to workers compensation benefits because that question is not before us. We do note, however, that the definition of employee in the workers compensation statute is virtually identical to the definition of employee in the wage payment statutes. Compare the expansive language in K.S.A. 44-508(b), " 'workman' or 'employee' or 'worker' means any person who has entered into the employment of or works under any contract of service or apprenticeship with an employer," with that contained in K.S.A. 44-313(b), " '[e]mployee' means any person allowed or permitted to work by an employer."

Finally, we agree with KDOL's position concerning the strong and longtime Kansas public policy of protecting wages and wage earners. As we stated in *Burriss v. Northern Assurance Co. of America*, 236 Kan. 326, 333, 691 P.2d 10 (1984),

"[t]hroughout the history of this state, the protection of wages and wage earners has been a principal objective of many of our laws. See, for example, K.S.A. 60-2307, originally enacted as G.S. 1868, ch. 38, § 6, providing that otherwise exempt personal property shall not be exempt from attachment or execution for wages; K.S.A. 44-312, enacted in 1901, giving preference to the payment of wages in the case of receiverships or assignments for the benefit of creditors; the statute restricting garnishment of wages, K.S.A. 60-2310, which reflects the rationale of G.S. 1868, ch. 80, § 490; and the wage payment act, K.S.A. 44-313 *et seq.*, enacted in 1973. K.S.A. 40-3103, like the statutes mentioned above, gives preference to wage earners, in order that they and the families dependent upon them are not destitute."

KDOL has generally reinforced this strong public policy with its authoring of K.A.R. 49-21-2(b)(6). That regulation not only declares certain agreements diluting employee rights under the KWPA to be per se failures to pay earned wages but it also nullifies those provisions violative of the Act:

"Any agreement by the parties or any requirement by the employer to contravene, set aside or waive any provision or any right created under the act shall be in violation of the act and equivalent to nonpayment of earned wages. Any provision contained in the employment agreement or contract that violates any provision or right created by this act shall not be enforceable, regardless of whether the parties have mutually assented to the provision."

As a further indication of the strong public policy of protecting wages, the legislature has created a stiff penalty for employers failing to pay wages already earned: 1% of the unpaid wages for every day they are not paid, up to a total of 100%. See K.S.A. 44-315(b).

Accordingly, we conclude that to deny or to dilute an action for wages earned but not paid on the ground that such employment contracts are "illegal," would thus directly contravene the public policy of the State of Kansas. See *Garcia v. Pasquareto*, 11 Misc. 3d 1, 3, 812 N.Y.S.2d 216 (2004).

We hold for the above reasons that the district court erred in concluding that Corral's employment contract was illegal under IRCA and therefore not enforceable under the KWPA.

Issue 2: *KDOL did not err in assessing penalties against Coma pursuant to K.S.A. 44-315(b).*

Next, the KDOL argues that the district court erred in reversing penalties assessed against Coma under K.S.A. 44-315(b). To the extent resolution of this issue necessitates statutory interpretation, this court's review is unlimited. *Schmidtlien Electric, Inc.*, 278 Kan. at 819.

K.S.A. 44-315(b) provides in part:

"If an employer *willfully* fails to pay an employee wages as required by K.S.A. 44-314, and amendments thereto, or as required under subsection (a) of this section, such employer *shall* be liable to the employee for the wages due and also *shall* be liable to the employee for a penalty in the fixed amount of 1% of the unpaid wages for each day, except Sunday and legal holidays, upon which such failure continues after the eighth day after the day upon which payment is required

or in an amount equal to 100% of the unpaid wages, whichever is less." (Emphasis added.)

Whether an employer willfully failed to pay wages is a question of fact. *Holder v. Kansas Steel Built, Inc.*, 224 Kan. 406, 411, 582 P.2d·244 (1978). Where an "honest dispute" arises over the amount of wages due, a statutory penalty will not be assessed against the employer. *Holt v. Frito Lay, Inc.*, 217 Kan. 56, 61, 535 P.2d 450 (1975) (citing *Bradshaw v. Jayco Enterprises, Inc.*, 212 Kan. 206, 510 P.2d 174 [1973]). However, " '[t]here is generally little room for an honest dispute.' " 217 Kan. at 61 (same).

In assessing penalties against Coma, the hearing officer stated:

"The law imposes a penalty computed at 1% per day to a maximum of 100% of the unpaid wages if an employer knowingly and willfully fails to pay wages when due. [K.S.A. 44-315] For that law, the court defines 'a willful act' as 'one indicating a design, purpose or intent on the part of a person to do wrong or to cause an injury to another.' [Citations omitted.] Whether Respondent 'willfully' and 'knowingly' withheld payments are issues of fact. [Citation omitted.]

"The actions of the Respondent were willful. The Respondent worked the Claimant and then refused to pay him for services rendered. Thus penalty of $3,720 shall be assessed."

We review an agency's findings of fact, *e.g.*, Coma's willful failure to pay wages, under a substantial evidence standard. See K.S.A. 77-621(c)(7). Substantial evidence supports the hearing officer's finding. Here, Coma undisputably employed Corral during the 6-month period. As stated by the hearing officer, "[t]he evidence as to the agreement, the work done and the payment of some wages is not conflicting and presents no issue of fact." Coma called no witnesses to refute Corral's evidence.

Despite substantial evidence establishing a willful violation, the district court vacated the penalty, declaring that imposing a penalty for the benefit of an undocumented worker was not intended by the legislature.

"In this Court's view, the award of the statute of the statutory penalty to an illegal alien tips the scale too much towards providing an incentive to illegal aliens to work in the United States and 'trivializes' the IRCA. Imposing the penalty for a willful violation also improperly serves to punish an employer (and reward an illegal alien) for willfully refusing to do something which is expressly forbidden by the IRCA. *The Kansas Legislature could not have intended such a result.* The

competing economic incentives and the policy objective of not employing illegal aliens are best served if Mr. Corral's remedies are limited to compensatory damages of unpaid minimum wages and interest." (Emphasis added.)

As suggested by the district court, the fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. *Schmidtlien,* 278 Kan. at 822. However, when a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be. See 278 Kan. at 822. The statute, K.S.A. 44-315(b), does not carve out any "illegal alien" exception. Its language is plain: "If an employer willfully fails to pay *an employee* wages as required by K.S.A. 44-314 . . . such employer *shall* be liable . . . to *the employee* for a penalty . . . ." (Emphasis added.)

Corral was a "person allowed or permitted to work by an employer," and was therefore an employee of Coma. See K.S.A. 44-313(b). Coma willfully failed to pay its employee his earned wages; Coma is therefore properly penalized under the plain language of the statute. The district court erred in reversing imposition of the penalty. To address the district court's concerns, the legislature may always consider amending the statute to provide that the civil penalty be awarded to the state and not to the undocumented worker. *Cf.* K.S.A. 44-5,120(k) (penalties imposed against the employer in workers compensation are paid to the workers compensation fee fund).

Coma also asserts that the KDOL erred in assessing the penalty because Corral acquiesced to a modification of the oral contract. According to Coma, Corral was told he would get paid once the restaurant started getting "more business," which Coma essentially argues is an unmet condition precedent to payment of his wages. However, the record on appeal does not reveal that Coma ever raised the acquiescence argument to the district court; it was not raised by or responded to by KDOL in its response, nor does it appear in the district court's written judgment. Because it appears for the first time before this court, we will not consider it. *State v. Puckett,* 230 Kan. 596, 640 P.2d 1198 (1982). We have reviewed Coma's other arguments and conclude they have no merit.

The judgment of the district court is affirmed in part and reversed in part. The judgment of the Kansas Department of Labor is affirmed.

ALLEGRUCCI, J., not participating.
LOCKETT, J., Retired, assigned.